UNITED STATES of America ex rel.
Jerry MAHAFFEY, Plaintiff,

v.

Howard PETERS, III, Defendant.

No. 95 C 6623.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 5, 1997.

Alan Michael Freedman, Freedman & Bornstein, Chicago, IL, Gary O. Prichard, U.S. E.P.A., Chicago, IL, for Plaintiff.

Arleen C. Anderson, Illinois Attorney General's Office, Criminal Appeals Div., Chicago, IL, Sally Louise Dilgart, Judy L. Deangelis, Cook County State's Attorney, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Jerry Mahaffey and his brother, Reginald invaded the Pueschel home, murdered a husband and a wife and tried hard to murder their eleven-year-old son. This was found by a jury which also decided that he deserved to die for what he had done, and he was sentenced to death. After unsuccessful challenges to the sentence in state court, he seeks to overturn the judgment in federal court. With neither fact nor law to justify his federal claims, he cannot prevail. I deny his petition for a writ of habeas corpus and allow the law to proceed on its stem course.

The crimes were discovered by the father of Jo Ellen Pueschel who found her dead body and that of her husband, Dean Pueschel in their home. He first found his severely beaten grandson, Richard wandering near the alley by the home. The eleven-year-old Richard swore that in the night he awoke to find himself in a headlock, being told by two separate voices to "shut up and be cool." He could not remember whether he fell asleep or was knocked out, but he did later wake and, in a daze, walked into his kitchen, where he was told to stay on the floor next to his mother. He did so, and saw his mother being struck.

Missing from the home were a video recorder, videotapes, an Atari game console, seven game cartridges, several items of the Pueschel's jewelry, along with a .357 magnum revolver and a shot gun. Pueschel's red Camaro was missing as well.

The Pueschel's Camaro was recovered on August 30, 1983 in a parking lot at 2245 West Lake Street in the Henry Homer projects.

On September 2, Jerry Mahaffey's brother, Cedric apparently made contact with the police and made statements which led to the arrest of Jerry and Reginald Mahaffey and the recovery from Jerry's residence of the video recorder, the Atari game and cartridges. In Reginald's residence was found the .357 revolver and 24 pieces of jewelry. At arrest, Reginald was wearing Dean Pueschel's ring and carrying his watch.

Both defendants confessed to an Assistant State's Attorney, and both confessions were read in full to the jury. Reginald's confession was ultimately admissible against Jerry Mahaffey because Reginald testified on his own behalf.

Jerry Mahaffey told the prosecutor that he and Reginald had discussed committing a burglary on the north side and drove to a clothing store at Howard Street and Western Avenue. Jerry saw a "paddy wagon" in an alley, so Reginald drove around the block and parked in a lot. After deciding not to burglarize the store, they were unable to restart their van. They walked away from it and saw an open window leading into a bathroom. They climbed through the window into the bathroom. They went into the "grown-ups' room" and the "boy's room" and then to the kitchen where Reginald picked up a knife. Jerry wiped everything Reginald touched "for not finding fingerprints." They went to the boy's room, and Jerry tried to strangle him with a towel, then they put a pillow over his head, and Reginald strangled him four to five times. The boy kept struggling, and Jerry hit him on the head with a baseball bat he found in the room.

The brothers Mahaffey each took a bat from the boy's room, went to the other room and proceeded to hit the man on the head with the bats. Reginald took the woman to the living room where he raped her and forced fellatio. Jerry went into the room where the woman was present but returned to the man's room where the man was pulling a pistol out. Jerry hit the man with the baseball bat and then returned to the living room. Reginald asked the woman where there were other guns, and she told them. They went to get them, two could not be removed from a locked rack, but Reginald did get a shotgun. The man started moving again, so Reginald stabbed him four or five times in the chest and the side.

Reginald asked the woman for the keys to the car and took her with him to the car so she could disarm the alarm. He took her back to the house, and Jerry loaded their stolen goods in the car. During his statement, Jerry Mahaffey identified as the stolen items those things recovered from his and his brother's residences.

After loading up the car, Jerry went back to the house and told the woman to lie down. The boy was now with her saying, "Ma, Ma, Ma, Ma." Reginald struck her on the head several times with the pistol which blows killed her.

The brothers then drove the car to Reginald's house where they left their stolen goods. After this, they abandoned the car in the Henry Homer projects.[1]

No prints of either of the brothers were found at the crime scene. There was physical evidence of intercourse, but no sign of vaginal trauma. The sperm was untypable.

The survivor of this offense could not remember what else happened, but in court he identified (at a 99% level of certainty) Jerry Mahaffey and Reginald Mahaffey as the two men in his home that night of August 28–29, 1983. Richard Pueschel conceded that he had been unable to identify either Mahaffey in a lineup conducted when he was being hospitalized for his wounds. He denied having seen photos of the Mahaffeys in the

---

1. Reginald Mahaffey's statement was not dissimilar. The differences were (a) Jerry said the clothing store burglary was abandoned because of the police vehicle—Reginald said it was because of the traffic; (b) Jerry said he wiped Reginald's prints, an act unmentioned by Reginald; (c) Jerry said the woman performed fellatio on Reginald, Reginald said it was Jerry who was fellated; (d) Jerry said Reginald stabbed the boy, Reginald said Jerry stabbed the boy; (e) Jerry said Reginald stabbed the man, an act unmentioned by Reginald; (f) Jerry said Reginald hit the woman over the head with the revolver, Reginald said that, as he left the house, he could hear "solid hits" which "told him [Jerry] was finishing the lady and her son off with the bats."

papers. He said he had only described the assailants, one as 5'10" or 5'11", 160 to 180 pounds, medium Afro, possibly scarred on his left cheek, and the other as 5'9" or 5'10", 150 to 170 pounds, skinny, short Afro and short moustache. An investigating detective had a different description in his reports and said his description was based on a canvass of residents in the Pueschel's apartment building. The description said one assailant was 25–30 years of age, 6'2", 210 pounds, scraggly beard, white shirt, black male, and the other assailant was 25–30 years of age, 5'4"–5'6", 125 pounds, dark clothing and a light-complected black or Latino.

The brothers Mahaffey were tried jointly. At trial, Jerry Mahaffey defended on grounds of coercion of the confession and the reasonable doubt arising from the absence of physical evidence and any identification other than that of the young, injured boy.

Reginald Mahaffey took the witness stand, denied his guilt, denied that any stolen property had been removed from his home, but then stated that he had purchased the stolen property from a man who visited his apartment shortly before the arrest. He also offered the theory that the real culprit was Cedric Mahaffey.

The police did not arrest Cedric Mahaffey despite his knowledge of unpublished details of the crimes and the fact that he was a light-complected black. Cedric Mahaffey's prints were never compared to the ones found at the crime scene.[2]

The jury convicted both men of all charges except that it acquitted Reginald of deviate sexual assault.[3] At the sentencing hearing, members of Jerry Mahaffey's family testified, and so did Mahaffey who denied committing the crime. His counsel argued that prison was so bad that life in prison was enough punishment, that no one should be executed and that the crime was not planned in advance. The jury thought the death sentence was called for under Illinois law, and the trial judge decided to sentence Jerry Mahaffey to death.

This habeas corpus proceeding presents an attack on the conviction and on the death penalty. The principal theme is a customary one of incompetency of counsel but some trial errors are raised as well and these involve some matters to which defense counsel did object at trial.

The defendant's arguments here are ably drafted, but they fail primarily because they are based on a misreading of the law, a misreading of trial counsel's position and the defense of it he was first asked to make several years after the trial and a misreading of the trial record. The principal arguments depend on a narrow focus on specific details combined with a relentless ignoring of the factual context of the case as a whole.

The recitation of the prior legal challenges to conviction and sentence may be tedious but what has gone before counts in habeas corpus law.

2. Ruling that Reginald Mahaffey's counsel had opened the door to an inquiry about what Cedric Mahaffey said to the police, the jury (after being instructed that the evidence was admissible only against Reginald Mahaffey) heard that Cedric Mahaffey told officers he knew who committed the murders, but would not say until he could be sure of their involvement. He asked if a gun was taken, and when told the answer was yes, Cedric Mahaffey correctly described the guns and agreed to tell the officers where the killers lived. He also produced a videotape he said was taken from the victims' home. He acquired the tape when a "friend" called him on September 1 to help "move some stuff." With his friend and another person, he helped move video equipment and cassettes, and he saw the .357 magnum and a 12–gauge shotgun. During the move, the friend said that he and the other person had gotten items during a burglary where they "killed a couple of people on the north side and a little boy lived." Finally, Cedric Mahaffey told the police the two persons were his brothers, Jerry and Reginald. One of the brothers told him they had gone to commit a burglary, and their van broke down. They left it, crawled through an open window, found a boy asleep and beat him. They found the man and woman, beat them, had sex with the woman, took property, and loaded it into the car that was in the driveway. Cedric Mahaffey told the police where the various items of property could be found.

3. The jury decided charges of murder (intentional, knowing and various forms of felony murder) of the parents, attempted murder and various forms of aggravated battery on the son. There were also charges of rape, deviate sexual assault (as to Reginald) and finally home invasion.

On automatic appeal, defendant raised the claims of (i) racially discriminatory jury selection, (ii) improper exclusion of one juror for her death penalty views, (iii) failing to notify defense counsel that the young boy who survived the attack had told prosecutors he could identify the killers in open court, (iv) wrongly refusing to grant a mistrial or a new sentencing jury after the mother of Jo Ellen Pueschel rose during trial to ask Reginald Mahaffey if he killed her daughter, (v) improperly admitting a medical record to prove the absence of coercion leading to a confession, (vi) failure to prove the corpus delicti, (vii) improperly conducting a joint death penalty hearing, (viii) improper closing arguments which undermined the presumption of innocence, appealed to fear, misstated the law and minimized the jury's sense of responsibility, (ix) the failure to prove one aggravation factor, (x) the refusal to instruct the jury that the alternative to death was natural life imprisonment, (xi) excessiveness of the death penalty, (xii) the absence of enough information for an adequate appellate review of the sentence, and (xiii) various flaws in death penalty procedures in Illinois, to wit, prosecutorial discretion, the absence of a burden to disprove mitigating circumstances, the inability to rely purely on sympathy and mercy and that blacks are more likely than whites to receive the death penalty.[4]

In the state post-conviction proceeding, defendant raised a constitutional claim based on the failure of the Illinois Supreme Court to apply its decision in *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988) to Mahaffey's case, another based on the failure to preserve the right of individualized sentencing, an argument that the allocation of peremptory challenges was wrong and an argument based on the issues resolved now in *Free v. Peters*, 12 F.3d 700 (7th Cir.1993). There was a lengthy attack on the competency of counsel. This argument was that counsel had a conflict of interest because it was his partner who defended Reginald Mahaffey, and that counsel failed to inter-

view witnesses, investigate mental disability shortcomings for mitigation and evidence suppression purposes, or give a coherent closing argument. He was also said to have committed errors which cumulatively made his defense incompetent. Apparently it was, around this time, that Mahaffey's post-conviction counsel tried to discuss the case with trial counsel. A letter dated Dec. 5, 1991 asked trial counsel to submit to an interview regarding his thought processes at the 1985 trial. He apparently refused to do so, and the state court refused to order a deposition.

This habeas petition rehearses the post-conviction arguments. I address each of them in turn, but first I will state the context in which Steven Decker, the defense counsel, had to make his decisions.

The crime itself was both heinous and heartless. No one here disputes this now and the Mahaffeys did not dispute it then.

What the jury heard here, what any jury would have heard, was the tale of a grandfather who, along with his wife, became concerned at the failure of his grandson, Richard to arrive so they could babysit for him. After phoning the boy's home and the parents' workplaces to no avail, he drove to the Pueschel house and found his eleven year-old grandson wandering, blood covered and beaten, outside the family home. Richard told him that "mom and dad are dead". The grandfather went in and saw the horrific scene for himself as did the jury by means of photography. While the grandfather and Richard waited for the ambulance, all the traumatized young boy wanted at that moment of his life was to have his grandfather open a soft drink for him. The grandfather was unable to do so that morning. This was a very powerful image of victimization, it is striking even in the dry text of transcript.

The killers entered the house the night before and slew the father by battering him with a baseball bat and stabbing him many times. The mother was battered to death too. The boy was severely battered and

---

4. In the case on direct appeal the Illinois Supreme Court reversed Reginald Mahaffey's conviction deciding that his case ought to have been severed in light of Jerry Mahaffey's confession.

On retrial he was again convicted and sentenced to death. *People v. Mahaffey*, 166 Ill.2d 1, 209 Ill.Dec. 607, 651 N.E.2d 1055 (1995).

stabbed. The killers stole jewelry, guns, a video recorder, a video game, video cassettes, and game cartridges.

The defendant, Jerry Mahaffey and his brother were both identified by Richard as the killers, and Jerry Mahaffey and his brother both confessed to being the killers, and in Jerry Mahaffey's case the confession of his brother was admissible against him.

By the time the jury set out to decide the penalty, it had found that Jerry and Reginald Mahaffey were the killers and it knew all of the details of the crime. The brothers entered the Pueschel home because their original intent to burglarize a store could not be carried out. Jerry Mahaffey systematically erased fingerprints, tried to strangle Richard with a towel and hit him in the head with a baseball bat. Jerry Mahaffey hit the father several times with a baseball bat. He also stood by (at the very least) while his brother criminally sexually assaulted the mother and stabbed the father and then battered the mother to death with a handgun. He helped steal their property and drove off in their car which he wanted to bum. He kept some of the stolen goods in his apartment. To devise a defense strategy counsel had to operate within the constraints presented by the facts found against his client and the constraints presented by his client's response to the charges.

Mahaffey begins his efforts here with an attack on the competency of counsel at sentencing, an attack unsuccessfully made in the Supreme Court of Illinois.

■ The standards by which counsel's competency is judged are well known since *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Their application to capital sentencing cases requires defense counsel to "make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors." *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989). What this means in practice is not very well known, although in the following cases counsel was deemed ineffective. In *Kubat, no* evidence in mitigation was presented and the closing argument was neither

logical nor coherent and presented the jury with a coda that served to aggravate rather than mitigate. In *Hall v. Washington,* 106 F.3d 742 (7th Cir.1997), defense counsel did virtually nothing to investigate mitigation and offered a diatribe against the death penalty as his sole argument for mercy. In *Brewer v. Aiken,* 935 F.2d 850 (7th Cir.1991), defense counsel had knowledge of Brewer's psychiatric problems and refused to use it despite the absence of any other mitigating theory and the fact that it might have supported his client's version that he played a lesser role in the offense. *See also Emerson v. Gramley,* 91 F.3d 898 (7th Cir.1996) (no effort by counsel).

In *Stewart v. Gramley,* 74 F.3d 132 (7th Cir.1996), counsel was competent who called witnesses to establish Stewart's difficult early life but failed to introduce other evidence of severe problems in Stewart's upbringing— this was so because counsel's conversations with Stewart turned up nothing remarkable in his personal history.

The summary of the rule in *Hall v. Washington* is simple. A decision not to present evidence "can rationally be made ... only after some inquiry or investigation by defense counsel.... This does not mean that only a scorch-the-earth strategy will suffice ... But it does mean that the attorney must look into readily available sources of evidence. Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." 106 F.3d at 749–50.

■ In this case, it is the mental condition and the psychological makeup of the defendant which is at the heart of this aspect of the habeas corpus challenge.

What Steven Decker did not do is have Jerry Mahaffey examined by a psychiatrist, nor did he review Mahaffey's grammar school records or speak to more of Mahaffey's family members. If he had done so, it is now said, he would have learned that Mahaffey is mentally retarded, has a psycho-

logical disorder, witnessed violence at an early age, and on occasions helped his youngest sister and the elderly.

What Steven Decker did is call three of Jerry Mahaffey's relatives—his mother, wife and sister—who testified about his upbringing in a bad neighborhood and his redeeming qualities as a family member, his loving relationship with his children and his nieces and nephews. Jerry Mahaffey testified to the terrible, punitive nature of life in prison. He argued reasonably well that which he could argue—the crime was fortuitous, not planned in advance, like a contract killing, that the jury should not kill anyone for all death is terrible, and that life in prison is so bad that it is punishment enough.

Why did Decker act as he did? We have his written answers to Mahaffey's questions. Decker's responses are designated as preliminary and there are some things which escape his recall [5] but his basic response, fairly read, is that he spoke to members of his client's family and to his client. He was unaware of the fact that a clinical psychologist would have found Mahaffey had a full scale I.Q. of 67 but even so would have waited before introducing such evidence (at the suppression hearing) because of his own knowledge of his client's ability to understand and communicate which I read to mean that Steven Decker did not think his client was retarded.[6] He did not see any need to have a psychologist examine his client (prior to the motion to suppress). While Jerry Mahaffey adopted the ploy of trying to portray some inability to read, counsel believed Jerry could read, and the introduction of evidence that he could not do so would have been fraud on the court. He had conversations with family members and anyone who indicated to him that they might have something useful to say. He interviewed the mitigation witnesses before putting them on the stand though this is disputed in part. He consulted with his client to discover if there were other witnesses that might be helpful on sentencing. He took some affirmative steps to explore past mental history, but does not recall what they were, and he believes that one reason he had no psychological examination performed before sentencing was his concern that his client would have confessed to the psychologist.[7]

---

5. Decker no longer has his case file. It either was routinely destroyed after the passage of some time or given to subsequent counsel. Mahaffey's counsel criticizes disposition of the file by noting that competency of counsel is an issue likely to arise in capital cases and that Decker ought to have kept his file. There may be some truth to this, but it sounds hollow in Mahaffey's mouth; the trial ended in February, 1985 and it was not until December 1991 that anyone ever attempted to interview Decker about the reasoning for his decisions in the conduct of the defense. Mahaffey had new counsel from the inception of the initial appeal process and they knew as well about the possibility of an attack on trial counsel's competence. If there are gaps in the historical record, they are as much or more the responsibility of Mahaffey's later lawyers as they are Decker's. And Mahaffey does not claim that his later lawyers were incompetent for failing to interview Decker at an earlier time. This is not surprising because it is *ordinarily* a tactical advantage to a defendant to let time pass and memories fade. Our law is that counsel's conduct cannot be defended on grounds that defense counsel does not offer. *Harris v. Reed,* 894 F.2d 871, 878 (7th Cir.1990). It is competent lawyering to wait and hope that the prior lawyer forgets all or part of the reasons for his actions. It is not very fair, however, to then offer belittling criticisms of trial counsel for failing to keep records to protect against forgetting.

6. I attach very little weight to counsel's post-hoc response to a question that essentially asks "If you knew you could have had a psychiatrist say your client was non compus mentis, would you have called him to the stand." Counsel who knows his strategy has failed may believe that any other option would be better than what was done.

7. Mahaffey's counsel mocks Decker's concern about a full confession to a psychologist. This risk could have been diminished by counsel's presence at the interview, but the value of a psychological examination in which defense counsel reserves the right to control defendant's answers is not likely to be very useful. The privilege is helpful, but counsel may be reluctant to depend on the privilege as an absolute protection of confidentiality. *See, e.g., United States v. Diamond,* 964 F.2d 1325, 1328 (2d Cir.1992) ("[W]e recognize the existence of a psychotherapist-patient privilege ... [h]owever, we also recognize ... that the privilege is highly qualified and requires a case-by-case assessment of whether the evidentiary need for the psychiatric history of a witness outweighs the privacy interests of that witness.") *See generally* Thomas Zambito & Mary Jo Layton, *Legal Experts See Erosion of Doctor–Patient Trust,* The Record, June 10, 1994 (Dr. Paul Applebaum, Chairman of the American Psychiatric Association's Council on Psychiatry

The clear purport of this is that nothing in his client's demeanor or actions showed Steven Decker that his client had a mental condition that would mitigate sentence, and in this regard he considered the written confession as well. Decker reviewed the conversations he had with family members, asked them for other potential witnesses, and interviewed trial witnesses and any others who indicated some contact with his client to see if they had something useful to say on sentencing. These are precisely the things which *Hall* said that defense counsel should do.

Steven Decker explicitly describes in the record before me an adequate investigation that he made into Mahaffey's sentence. It is implicit that based on his dealings with his client and his client's family that he saw no basis to pursue a psychological defense.[8]

There is no need to conduct an evidentiary hearing on counsel's reasons for his actions. He has explained them in written deposition, and it is clear that he would not be able to recall all of his reasons. His primary reasons, these he does recall and state, and nearly all of these are clearly inferable from the record. I did hold a hearing on May 22, 1997 with respect to certain concrete actions that Decker alleges he took and others deny, and I find as follows.

At the May 1997 hearing Myrtis Mahaffey testified that she had not been prepared for her appearance as a witness at Jerry Mahaffey's sentencing hearing. She also denied having much conversation at all with Steven Decker. Yet she did concede that she spoke to him once or twice a week during the time that he represented Jerry. And she admitted having called Steven Decker for legal advice within two months previous to the May 1997 hearing. I credit Decker's testimony that he prepared Myrtis Mahaffey for her testimony.

On the written transcript and even more so in the courtroom, Myrtis Mahaffey is an unhelpful and inarticulate witness. It is incredible that the testimony she gave at trial could have been accomplished without decent preparation. Jerry Mahaffey was not a credible witness. I found that he did not answer questions in a truthful manner but rather with the aim of improving his chances in this case. His description of Steven Decker's conversations with him before and during trial is patently false given the evidence that was presented at trial (including Mahaffey's testimony on motions and at sentencing). Indeed Mahaffey reaches (or, more properly, overreaches) beyond his own counsel's present contentions about the nature of the incompetency of counsel. Here, too, I believe Steven Decker. Moreover, if the Jerry Mahaffey I saw in 1997 is like the Jerry Mahaffey that Steven Decker saw in the mid–1980s, then Decker is not to be faulted for failing to consider mental retardation. Prior to his arrest Mahaffey was employed full time, living with his family and reasonably capable of holding his own under examination. Mahaffey may not read well but I doubt that he is illiterate. It is true a psychologist found him nearly illiterate, but I doubt the result of any test which requires an earnest effort from Mahaffey who is, I believe, conscious of the fact that demonstrating an ability to read will not help his case. It is also true that Decker tried to give the trial court the impression that Mahaffey might not be able to read or understand the *Miranda* warnings. But Decker did not regard either of these things

---

and the Law, noted a marked increase in the number of cases where courts allowed a breach of the doctor-patient privilege.) A full confession to a psychologist might put counsel in a difficult ethical position. More importantly, though, counsel does not now specifically rely on this, a psychological assessment which is made in the absence of a defendant's version of his mental state during the offense may be valueless. Indeed, Dr. Harry Gunn, Mahaffey's psychologist, here never explains in any way how it is that Mahaffey's criminal conduct is explained or mitigated by his mental condition. Dr. Gunn does not say Mahaffey did not know the seriousness of the offense or could not control himself or followed his brother down the path of evil. This contrasts to his clear opinion that it is highly probable Mahaffey did not understand the *Miranda* warning. Even without these considerations, Decker had an adequate basis for not seeking psychological examination, that is, his impressions of his client.

8. In his affidavit, Mahaffey does not deny that he conferred with Decker. He specifically denies that Decker asked him about witnesses for the sentencing hearing.

as truthful, and he did not have to regard them as so in order to argue that the prosecution failed to prove a knowing waiver of *Miranda* rights.

Finally, I credit Decker's assertion that he prepared Rita Mahaffey for her testimony. Steven Decker did consider calling family members at trial, and I believe that he reasonably "thought the best ones to put on the stand were those that were called...." Decker knew, after all, about the "division among the family ... animosity between different members of it as a result of the ... events that led to [Jerry's] arrest, which was put in force apparently by one of his brothers."

In sum, the evidentiary hearing and the written record establish that Steven Decker could have spent more time on the case and made further investigations. It does not establish that Steven Decker should have done so.

These decisions are within the range of reasonable competence [9] But even if they are considered without according any deference to Decker's judgment, Mahaffey could not show prejudice under *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

Consider first the evidence of mental retardation. A clinical psychologist found a verbal I.Q. of 71, a performance I.Q. of 67 and a full scale I.Q. of 67—all of which constitutes mild mental retardation. Mahaffey's counsel say

> Evidence of mental retardation is perhaps the most significant mitigating factor there is to defeat the death penalty.... This opinion is confirmed by numerous social scientific studies which make clear that ... the overwhelming majority of Americans also oppose the death penalty for mentally retarded defendants.

Despite this assertion, there are no "numerous social scientific studies" cited, there is only one, and it does not establish that evidence of mental retardation would have

any reasonable probability of affecting the outcome here. Most of what is offered is simply the unscientific opinion of death penalty defense counsel, one in affidavit form and the other in the form of a law review article. *Blume and Bruck. Sentencing the Mentally Retarded to Death, An Eighth Amendment Analysis,* 41 Ark L.Rev. 725 (1988). Their reasoning largely precedes from public opinion polling data of the sort cited by the court in *Penry v. Lynaugh,* 492 U.S. 302, 334–35, 109 S.Ct. 2934, 2955–56, 106 L.Ed.2d 256 (1989), which rejected the proposition that such polling data means the Eighth Amendment bars execution of the mentally retarded.

That many people do not think the mentally retarded ought to be executed is not of use, per se, in all cases. Mental retardation ranges from the mild to the severe, and no polls cited to me tend to prove that a person committing the offense in this case would be helped on mitigation of evidence of mild mental retardation. *See Penry,* 492 U.S. at 338–39, 109 S.Ct. at 2957–58.

There is one study that relies on more than generalization. In a project designed to determine the differences between death qualified jurors and non-death qualified jurors, a pool of 717 eligible jurors was given a hypothetical case involving insanity defenses—two psychogenic, two organic. The mental retardation case was this:

> [A] 32 year old man with an I.Q. of 60 took his father's gun, robbed a liquor store and killed the proprietor, after watching a television program about a gang of hold-up men. [He] said that he robbed the store because he wanted money to buy candy and cigarettes and that he shot the proprietor "because robbers are supposed to." The defense psychiatrist said [his] intelligence is so limited that he could not have appreciated the seriousness of his crime.

What the survey showed was that both death-qualified and non-death-qualified jurors were just about equally likely to accept mental retardation as a defense. One could

---

9. The only way in this case that Mahaffey can prevail on his claim of inadequate investigation is to assert that capital defense counsel must always seek psychological examination and must

always seek to examine grammar school records. Petitioner's counsel candidly state that there is no precedent cited for the proposition.

also read the study to show that organic mental disorders are likely to find more favor with jurors than purely psychogenic ones. *See* Ellsworth, Bukatz, Cowan & Thompson, *The Death Qualified Jury and the Defense of Insanity,* 8 L. & Human Behavior 45 (1984).[10]

The Ellsworth study does not carry weight here.[11] In this case, there are two homicides carried out over a period of time by two persons, one of whom, Jerry Mahaffey, made successful efforts to eradicate evidence of fingerprints thus demonstrating understanding of the seriousness of the crime. Moreover, Jerry Mahaffey has consistently denied the crime and never offered an explanation for his actions, e.g., that he acted because he imitated what he saw on television or because he simply did as he was told by his brother. Even a lawyer who had read the Ellsworth article would have eschewed mental retardation as mitigation at least in part due to his client's refusal to offer (even today) an explanation of his actions that *paired with* evidence of mental retardation would serve to mitigate the offense.

Next, the psychologist who examined Mahaffey found borderline personality disorder whose characteristics include "impulsiveness, mood instability, inappropriate anger or control of anger." Mahaffey, said the psychologist, "finds it extremely difficult . . . to be able to control his impulses." The psychological disorder "can lead to periods of intense anger and acting out as well as emotional instability with extreme reactive shifts of mood and affect."

This is unpromising as mitigation although it might have a minimal chance of success if it were supported by some evidence that the personality disorder played some role in the conduct of the offense. But, it was not. The offense itself, as the Mahaffeys accounted for it in their confession, arose neither out of anger or impulse, it arose out of greed and the desire to leave no witnesses. Of course, Mahaffey could have explicated his conduct in some psychological way or merely could have claimed a kind of emotional overload that prevented him even from recalling what he had done.

The evidentiary use of mental disease or defect has to be anchored in some account of the criminal acts in order to have any real weight with the jury. The relevant statute says so too since it speaks of finding mitigation in the fact "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. . . . " Ill.Rev.Stat., 1983 Ch. 38, Section 9–1(c). It matters not what disease or defect exists if it cannot be tied to the crime, and it is very difficult to do so when defendant persists in denying participating in the crime. For example, if the survivor had said the perpetrators were angry, or Jerry Mahaffey said he was angry, or Jerry Mahaffey said he could not recall what he was doing at the time of the crime, then at least the door to the mental condition mitigation is ajar. The door was never ajar here.[12] Even if it

10. Judge Easterbrook considered this study and another, *Project. Standardless Sentencing,* 21 Stan L.Rev. 1297 (1969), and observed "[w]hether such defenses actually help the accused is a close question. The Stanford study finds no effect.... And the Ellsworth study a small one." *Brewer v. Aiken,* 935 F.2d 850, 862 (7th Cir.1991) (concurring opinion).

11. The Assistant State's Attorney who argued and briefed this case was unfamiliar with the Ellsworth study. It is hard to understand how one could try to defend this death penalty judgment without apparently reading the Ellsworth article. Nonetheless, the distinctions between Mahaffey's case and the hypothetical cases are obvious.

12. There is an interesting contrast between this case and the prosecution of Andrew Kokoraleis, another capital case in which I have issued an

opinion. Both trial counsel were circumscribed by what their clients had said to them, but in different ways. Andrew Kokoraleis' trial counsel did not need to have his client give an account of a disordered mental state during the crimes, the nature of the crimes themselves was enough but his ability to make the claim in mitigation foundered tactically on the fact that Kokoraleis swore that he played no role of any kind in the crimes during the guilt phase of the trial when he concededly received effective representation. Jerry Mahaffey's trial counsel was constrained by the fact that the nature of the crime (described by a survivor or described by the perpetrators) did not suggest a mental condition which would mitigate the offense. The only way psychological opinion about Mahaffey could be related to his crimes was for Mahaffey to state some factual basis for the relationship. This course would have been tactically available to his counsel (whose client

were, I could not find prejudice because this evidence shows only that the petitioner is both dangerous and out-of-control, and there is no reasonable probability that it would cause a single reasonable juror to vote against the death penalty on this ground alone. This is also precisely the kind of evidence of non-organic disorder that Judge Easterbrook noted as lacking injury appeal. He is right. *Brewer v. Aiken,* 935 F.2d at 861 (concurring opinion).

This leaves the items which Myrtis Mahaffey says she wishes to add to the testimony she gave. Essentially, she portrays herself as a poor mother who thought the correct response to a dispute between her daughter and another girl was to see that they staged a fair fight. She told the other mother, "Your daughter and my daughter, Rita are going to learn to defend themselves." She then watched the fight. Her children were rough, they would fight and break furniture. She says, without apparent irony, that "I don't know what they'd fight about. They just didn't seem to have basic respect for each other." At times, she told them "I'm going to let you kill each other and just come back and bury whoever's left." When Jerry Mahaffey was six or seven, she fell into depression for many, many months. Jerry was always slow in school.

Rita Mahaffey, Jerry's sister, would have added to her trial testimony that Jerry would walk her home, that he was good at lifting people's spirits and either could not read or could not read too well. Other brothers and sisters say that Jerry was good to them. One set of neighbors would say that Jerry Mahaffey was a nice person. The most detailed description comes from an older sister who recounted that a man held a gun to Jerry's head when he was in grammar school (although Jerry himself does not recount this incident). Oddly enough, this sister said that "Jerry didn't have a temper," and she only learned later that he could not read; her son helped Jerry learn how to read.

This evidence is, in the setting of this case, worth very little. It is unclear from this family evidence whether Jerry Mahaffey could, in fact, read when the offenses were committed. Much of it is the same general evidence of a hard life in the neighborhood cumulative of that already offered. The evidence of lack of temper does not fit very well with the described borderline personality disorder. In sum, the additional evidence from the family and neighbors is largely cumulative. To the extent there is something non-cumulative, it can be construed in two ways. Either Jerry Mahaffey was part and parcel of a fighting and destructive set of violent siblings which is not a comfort to any juror seeking mitigation. Or, Jerry was kind to his siblings and his neighbors which does not mitigate what he did to strangers.

There remains the possibility that defense counsel could use all of this evidence in combination, but the fundamental problem of tying the mental condition to the mechanics of the crime remains even if one adds the testimony of family and neighbors. And the evidence that Jerry did not have a temper does not help the claim of borderline personality disorder, and not one family member actually opines that Jerry Mahaffey was retarded in any sense other than his slowness in school.

It is no barrier to Mahaffey's petition that evidence could be aggravating as well as mitigating. This fact can justify counsel's decision not to use evidence, even a decision that is ultimately proven to be wrong.[13] But my judgment is not that this evidence can be aggravating, it is my judgment under the specific facts of this case that there is no reasonable probability that it would mitigate the sentence, that some of it would almost certainly aggravate the offense is beside the point.

Mahaffey's argument is that the mental condition evidence is not inconsistent with counsel's strategy at sentencing. This is so,

did not effectively foreclose it by swearing to his innocence at the guilt phase) except for the fact that Mahaffey steadfastly denied the commission of the offenses and would provide nothing to link his mental condition to the dynamics of the crime.

13. My view that counsel's conduct was competent is, of course, not based on his conscious decision not to present the evidence; it is based upon his conscious decision not to pursue a course of action which would have lead to the creation or discovery of such evidence.

he claims, because counsel conceded, as he had to, that the jury found Mahaffey guilty. No longer disputing guilt, or seeking to rely on a residual doubt theory, Mahaffey reasons, his lawyer could easily have argued mental condition which practically (though not logically) concedes guilt. Conceding that the jury found his client guilty is not the same thing as conceding guilt which Jerry Mahaffey was emphatically unwilling to do. Yet, any counsel needs to exercise care when making arguments of the sort Mahaffey suggests here. As Mahaffey notes, the credibility of counsel's argument against a finding of guilt had already been rejected and some caution must be exercised before new arguments, even arguably inconsistent ones, are made. Sentencing arguments are best when they build on the arguments made in the guilt stage.[14] Even if this problem could be overcome, the fact remains that Steven Decker could not connect the mental condition to the mechanics of the crime. His client might have done so, and the surviving witness might have done so, and the analysis of the criminal actions and their aftermath might also have served this purpose, but they didn't. The Ellsworth study showed how mental retardation can work to mitigate an offense where the retarded defendant killed because he learned from television that "robbers are supposed to." Mahaffey's counsel did not have the building blocks he needed to do what his client now says he should have done even where it is fully consistent with the defense.

It is difficult not to notice that habeas corpus counsel do not ever (in briefs or oral argument) provide a version of the closing argument they suggest. I suspect this is so because it would be neither coherent nor persuasive.

Steven Decker made a judgment not to seek a psychological examination, a judgment based on his dealings with his own client and his dealings with his client's family. Nothing that Jerry Mahaffey or his family say, even now, gives a basis for finding that judgment to be an act of incompetence. There is another decision Steven Decker made, although one must infer this from his 1996 answer to the question of why he did not seek early psychological examination. He decided he did not want his client to confess the crime to anyone including, I infer, himself. No one now criticizes this decision. Jerry Mahaffey's present counsel has filed an affidavit signed by his client; it is without an inculpatory statement. If one takes it as a given that Jerry Mahaffey cannot or will not give an account of the crime or, at least, of his mental state at the time of the crime, then the failure to have a psychological examination is meaningless in this case. Even if Steven Decker knew in advance (which he could not) that he would get an expert like Dr. Harry Gunn and receive a report like Dr. Gunn's, he would still be left with no way to tie the defendant's mental state or status to the commission of this crime. Steven Decker was limited then, as Mahaffey's counsel is now limited, by what his client told the Assistant State's Attorneys and by what his client was willing to say on the witness stand which presumably is that he had no loss of memory and had nothing to do with the crime and was therefore under no extreme emotional or mental disturbance.

I have read the record and reject the claims of incompetency of counsel.[15]

14. The dilemma is the reason that some lawyers have argued that a new jury ought to be empaneled for sentencing. Courts have rejected this claim but not because they did not acknowledge the existence of the dilemma. *Cf. McGautha v. California*, 402 U.S. 183, 221, 91 S.Ct. 1454, 1474, 28 L.Ed.2d 711 (1971). The credibility of counsel's arguments does matter. Defense counsel can, of course, put the prosecution to its proof, arguing reasonable doubt and, failing this, can then say to a sentencing jury "my client has the right to insist on proof beyond a reasonable doubt which is all he did, now that you have found him guilty, you ought to know something about how he came to be guilty." This is diffi-

cult to execute. Steven Decker left this path open for his client, but his client did not provide a vehicle to use to travel on it.

15. Petitioner criticizes the way the state court addressed the issue. The Supreme Court of Illinois does know how to apply *Strickland v. Washington* to claims like the one made here. *See People v. Perez*, 148 Ill.2d 168, 170 Ill.Dec. 304, 592 N.E.2d 984 (1992) (reversing death penalty for failure of counsel to investigate and present evidence of defendant's mental history). On the conduct of this mitigation hearing, a unanimous Court found that Jerry Mahaffey could not demonstrate prejudice, could not "prove that there is

## Incompetence of Counsel on Defense at Trial Conflict of Interest

■ It is not clear whether Jerry Mahaffey persists in his claim that Steven Decker had a conflict of interest because his law partner represented Reginald Mahaffey. This lack of clarity is due to the absence of the claim in Jerry Mahaffey's papers filed in response to the decision in *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996) (en banc), *rev.*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

■ The claim, I find, is without merit. Representation of one defendant by a law partner of a co-defendant is not a per se violation of the Constitution. *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Actual conflict must be shown. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The conflict said to exist here is that Steven Decker should have argued that the crime was committed by Cedric Mahaffey and Reginald Mahaffey. Decker explained his refusal to do so with a question "If Cedric was a purported perpetrator of the offense, why would he name one of his co-conspirators?" The question serves as an adequate answer, indeed a persuasive answer, as to why Jerry Mahaffey's trial counsel would not want to suggest the guilt of Reginald. It is not credible that Cedric would name one of his co-conspirators and lie about the other, the personal risk to Cedric is too great. Otherwise, it is clear that Decker did suggest to the jury that Cedric Mahaffey was a perpetrator of the crime. The brothers Jerry and Reginald offered consistent defenses—"I did not do it and my confession was coerced." There was no conflict and each gave the other support on the coerced confession claim.

## Failure to Obtain and Use Evidence at the Motion to Suppress

There are two parts to this claim.

■ First, there is a recurrence of the theme that Steven Decker ought to have had Jerry Mahaffey examined by a clinical psychologist. In this aspect of the case, the argument has more force than it did in the mitigation context because the psychologist's opinion can be tied to the facts of the case. Dr. Harry Gunn does say it was highly probable that Jerry Mahaffey did not understand his *Miranda* rights. Steven Decker's written answers on this subject tell us, if fairly read, why Decker did not have a psychological examination conducted. He thought the evidence would be questionable "given [Mahaffey's] written statements and my other knowledge as to his abilities to understand and communicate." This is why Decker now says he might have presented psychological evidence like that of Dr. Gunn only after all the other evidence was in. It is also the reason why he would not seek to obtain such evidence since, based on his impression of Jerry Mahaffey, including his ability to read, there was no reason for competent counsel in Decker's position to suppose a report like Dr. Gunn's would be forthcoming.[16]

Indeed, Steven Decker today says only that it is "possible" he would introduce Dr. Gunn's evidence even if he had it. As an

---

a reasonable probability that, absent counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *People v. Mahaffey*, 165 Ill.2d 445, 466, 209 Ill. Dec. 246, 257–58 651 N.E.2d 174, 185–86 (1995). The Court regarded the additional evidence from the friends and family as cumulative, it regarded the evidence of psychological impairments as not inherently mitigating and emphasized its evaluation (with which I agree) of the sentencing result as driven by the fact that Jerry Mahaffey had escaped from prison while the murder charges were pending and refused to say that he would not escape again.

There is nothing in *Strickland* or in Supreme Court jurisprudence that precludes a state court from conducting the analysis of adequacy of representation by addressing only the prejudice prong of the analysis. My analysis of the claims addresses both prongs and comes to the same conclusion.

In simple terms, it is not arbitrary or inconsistent with Supreme Court precedent to decide that the mitigation evidence would *not* have made a difference and this, consistent with the facts and circumstances of this case, is what the Illinois Supreme Court did here.

16. Decker believed that Jerry Mahaffey could read. Dr. Gunn seemingly concludes that Jerry Mahaffey could read but at a level below the lowest 1% of the population which I assume means the lowest 1% of the population who can read.

experienced defense counsel, he may well have been aware that the prosecution could also present expert evidence that even more severely retarded persons, particularly those with prior criminal experiences, would understand *Miranda. See People v. Henderson,* 83 Ill.App.3d 854, 863–64, 39 Ill.Dec. 8, 16, 404 N.E.2d 392, 400 (1st Dist.1980). There was the further risk that in asking the trial court for appointment of a psychologist to determine competency to waive *Miranda* rights, defense counsel might have opened the door to the prosecution to request or the Court to order on its own a psychological examination by the court psychiatrist to determine competency to stand trial under Ill. Rev.Stat.1983, Ch. 38, Sec. 104–11 and 103–13 (now 725 ILCS 5/104–11 and 5/104–13). Damaging statements made by defendants in such interviews are not admissible absent the raising of a mental condition defense but even inadmissible statements give an advance look to the prosecution of what the defense might have (or, more importantly, not have) to offer. It is true that Steven Decker does not expressly state this, but a practitioner experienced in criminal defense in Cook County would, I think, routinely give consideration to these matters in every case. It is apparent from the hearing that defense counsel did adopt a strategy of disclosing as little as possible to the court and the prosecutor. And it does not matter if he did not, the impression his client gave him is grounds enough to explain why no psychological examination was called for here.

There is another more important reason why the psychologist does not matter in Jerry Mahaffey's case, and this reason applies also to the second part of this argument about incompetence which is based on the affidavit of Charles Patterson, a neighbor of Jerry's who heard screaming from the Mahaffey apartment on the night Jerry was arrested. He also heard various thuds and similar sounds which lead him to conclude that someone was being beaten. This would corroborate to some extent Jerry's claims of coercion. Of this potential testimony Decker was unaware, but he does say he is uncertain whether he would have called Patterson as a witness because "he may not have been able to support Jerry's position that he … Physi-cally showed signs of being abused at the time of his arrest." This latter concern is justified because Patterson never saw Mahaffey that night.

Patterson's evidence is critical, says Mahaffey's present counsel, because the "question of whether Mahaffey was brutalized by the police therefore came down to a credibility determination between two groups of biased witnesses: the testimony of Mr. Mahaffey and his wife against the testimony of the police officers who allegedly brutalized Mr. Mahaffey" so "a disinterested witness would have been extremely significant."

This is not an accurate statement of what occurred at trial.

The credibility determination came down to a choice between Jerry Mahaffey and his wife on one side and (1) the police officers, (2) the Assistant State's Attorneys, (3) an Emergency Medical Technician, and (4) a photograph of Jerry Mahaffey taken around the time of his interrogation.

The interrogation photograph which I now have on my desk shows Jerry Mahaffey holding a soft drink can in one hand and a cigarette in the other. There is no sign of the substantial injury he claimed was inflicted by a blow to his nose. The EMT at the Cook County jail recorded no evidence of trauma or complaints of brutality. Jerry Mahaffey testified he made a complaint of brutality to an Assistant State's Attorney, but the prosecutor credibly denied this. Another Assistant State's Attorney heard no complaint of brutality. A denial of any claim of mistreatment appears in the petitioner's written statement, and neither prosecutor saw evidence of prior mistreatment. They both thought his statement was voluntary and that he understood his rights. One prosecutor testified that Jerry Mahaffey read his confession and corrected the spelling of one word.

This is to be weighed against at least one inherently incredible aspect of Jerry Mahaffey's story. Several police officers testified that he had made incriminating admissions in his home and in the car on the way to the station and these same officers denied brutality. In his testimony, Jerry Mahaffey, pur-

suing an apparent policy of denying everything, contradicted both police assertions; that he incriminated himself and that the police did not abuse him. This left him in the position of arguing that in the face of atrocious physical violence he steadfastly refused to confess to officers who were torturing him. Only after the torture stopped and he was in the presence of two prosecutors and a court reporter, did he admit to the crime. Both of these two assertions can logically be true, but it is difficult to believe both. And the trier of fact did not believe at least one of them, the claim of coercion.

■ Under the law, the decision on questions of voluntariness and *Miranda* compliance are decided by the preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The trial judge found by "the great weight of evidence" there was no brutality and that overwhelming evidence refuted claims of brutality and claims of *Miranda* violations. On this record, the decision is clearly correct and neither testimony of Patterson nor Dr. Gunn had any reasonable probability of altering the result. Steven Decker's choices were limited by the state of the evidence and the court and not by lawyerly incompetence.[17]

■ There is a minor argument that Decker should have introduced evidence of a pattern and practice of police brutality in Area 2 from whence came the police officers who arrested Mahaffey. What present counsel produced here is not admissible. It is not tied to any of the officers who participated in a major way in this case. Habits and practices may be admissible, but not if they are not those of someone whose conduct is not at issue in the case. And this evidence, too, would have failed to carry the day because of the particular facts in this case.

**17.** It is significant that Dr. Gunn never opines that Jerry Mahaffey is, or was, unable to recount concrete details of his experiences.

**18.** *Stewart v. Lane* also resolves Mahaffey's claim that refusal to apply *Gacho* to his case on appeal

### The Closing Argument at the Sentencing Hearing

In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the Court held that a capital defendant is entitled to have the jury told that the alternative to the death sentence is life imprisonment without parole where that is what state law provides *and* the prosecution has raised the question of future dangerousness. It is apparent from reading *Simmons* that the issue before that jury was whether the jury ought to risk the threat posed by the possibility of paroling a dangerous man.

■ Jerry Mahaffey argues that the rule in *Simmons* was violated in his case. His argument fails because *Simmons* is not retroactive, therefore does not apply to his case, and, even if it were, it would not require vacating the death sentence. *See Lambrix v. Singletary*, — U.S. —, —, 117 S.Ct. 1517, 1525, 137 L.Ed.2d 771 (1997) (holding that a case decided after a habeas petitioner's conviction and death sentence became final was a new rule under *Teague v. Lane* and therefore did not apply retroactively).

■ In *Spreitzer v. Peters*, 114 F.3d 1435, 1447–48 (7th Cir.1997), the Seventh Circuit affirmed its earlier ruling in *Stewart v. Lane*, 60 F.3d 296, 299–302 (7th Cir.1995), that *Simmons* was not to be applied retroactively. A closely divided court in another circuit reached the same conclusion. *O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir.1996) (en banc). To the extent that this issue was raised on a federal constitutional basis in state court, it was rejected on retroactivity grounds on the first appeal. *People v. Mahaffey*, 128 Ill.2d at 430–31, 132 Ill.Dec. at 386–87, 539 N.E.2d at 1192–93. I am unpersuaded that it was ever raised on direct appeal as a federal constitutional claim that was adequately articulated. Certainly the Supreme Court of Illinois thought the only applicable precedent was its state law decision in *People v. Gacho*, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988).[18]

was a denial of equal protection. This is, at bottom, a challenge to the power to apply decisions prospectively. This is so because all decisions which are limited, in any way, in retrospective effect draw arbitrary lines affecting favorably some litigants and not others whose only differ-

■ In any event, *Simmons*, if applied here, would not affect the outcome. The prosecution's arguments on sentence consume just short of sixteen pages of transcript.

In controversy are these lines,

When they tell you that they will spend the rest of their lives in prison, there is no guarantee. [objection overruled]

. . . . .

There is not guarantee, ladies and gentlemen, not only because of what the law may say but because of what you heard from that witness stand. You know who you are dealing with.

(R. 4240–41)

We will not tolerate it. You should not let them go. [objection overruled] You will be letting them go because you will be turning your back on the law and on justice. They will be let go. These two men who will not even say they were sorry for what they did. [objection overruled] They will have beaten it, make no mistake about it.

(R.4243)

The closing arguments and the mitigation hearing evidence focused on the fact that Jerry Mahaffey escaped from the Cook County jail while these charges were pending. "On March 23 both Mahaffeys were armed with guns, both Mahaffeys escaped from the Cook County jail.... Jerry Mahaffey ... tells you from this witness stand" that if given the opportunity to escape again, he doesn't know if he would do it.

The problem in *Simmons* was the suggestion that a defendant should be executed because otherwise he might be paroled. The only sentence of the argument in this case that might suggest such a possibility is "there is no guarantee ... not only because of what the law may say." But, the implica-

tion from this sentence that the prosecutor is suggesting parole is neither necessary nor reasonable. *See Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1384–85 (7th Cir.1994). The prosecutor was talking about escape. It is rare that a prosecutor can do this, so the argument is rarely seen. Jerry Mahaffey, in custody for two capital murders, escaped from the county jail, and, in so doing, gave his prosecutors the right to claim that he was a man who would be dangerous to others in the future. The same law which would say he should stay in prison for life also said that he should remain in custody while awaiting trial. He escaped at gun point. This is the argument that was made and it does not trigger the application of *Simmons*.

The argument that anything less than the death penalty will be a letting go of defendant was nothing more or less than a comment that the death penalty was the only just and legally correct sentence. No juror could have been under the impression that the choice was literally execution or letting go.

### Peremptory Challenges

■ At the time of trial, Illinois allowed each defendant in a capital case a total of twelve peremptory challenges. The prosecution was allowed the same number as all defendants combined. Jerry Mahaffey had twelve, Reginald Mahaffey had twelve and the prosecution had twenty-four.

The petitioner makes a unique argument that allowing him half as many challenges as the prosecution is a violation of the Constitution. The short answer is that the prosecution had the same number of challenges against each defendant and as each defendant had against it; twelve to be exercised against one defendant and twelve against the other.[19] If this is not so then it is argued

ence may be the fortuity of their appearance before courts with shorter briefing schedules and quicker decision times. A state court can constitutionally make its decision fully prospective and in doing so, draws no less an arbitrary line than does the federal system. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). *See also Liegakos v. Cooke*, 106 F.3d 1381 (7th Cir.1997). I find no support for a proposition that if some trial judges gave a *Gacho* instruction before it was required by state

law, then it is an arbitrary denial of equal protection to refuse to require it in all cases, nor for a proposition that some eight defendants whose cases were on direct appeal when *Gacho* was decided were denied a federal right because *Gacho* was not applied to them.

**19.** At trial, the prosecution used thirteen, the defendants together used eighteen.

that *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), required that for every procedural right given to the prosecution, the same right must be given to the defense. *Wardius* did not say this, it required only that there be some balance—a state could not require complete discovery of the defense alibi without giving any discovery to the defendant. The Court did not attempt to qualify the balance in any other contest. Oddly enough, if petitioner is correct, existing federal criminal trial practice is unconstitutional. Most federal judges trying a two defendant case would give the prosecution six peremptories and each defendant five. *See, e.g., United States v. Banks,* 687 F.2d 967, 976 (7th Cir.1982); Fed.R.Crim.P. 24(b). *See generally Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 2278–79, 101 L.Ed.2d 80 (1988) (commenting that the right to peremptories is impaired only if defendant does not receive that which state law provides). If one were to look for a *Wardius* compensating balance in Illinois law, one could find it in the right of the defendant to demand a jury in the first place which right the prosecution does not possess in Illinois. *See People v. Mueller,* 281 Ill.App.3d 1, 2, 217 Ill.Dec. 246, 247, 666 N.E.2d 915, 916 (5th Dist.1996); Ill. Const. art. I, § 8.

The Illinois Supreme Court's decision on this point is entitled to deference under habeas law. *People v. Mahaffey,* 165 Ill.2d at 453–54, 209 Ill.Dec. at 252, 651 N.E.2d at 180.

### Individualized Sentencing

■ The petitioner argues that a joint sentencing proceeding deprived him of the right to individualized sentencing. The basis of this claim is essentially that the prosecutors rarely differentiated between the brothers Mahaffey in closing argument, that evidence against Reginald was heard by the jury and that the brothers are "similarly aged black men from the same family" and (impliedly) the jury could not distinguish between them.

■ This argument works just as well, or as badly, for severance of the defendants at trial as well as sentencing. Jerry Mahaffey makes no argument here that he was entitled to severance at trial. He confines his claim

to sentencing because he can cite precedent which requires individualized sentencing in death penalty cases. *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Nevertheless, the same rule applies with equal force to determinations of guilt and innocence. Ordinarily, jurors are instructed to give separate consideration to the case of each defendant as this jury was instructed. As a general principle, we accept that jurors can distinguish and do distinguish between separate defendants and the evidence against each of them. Evidence that in society as a whole, there exists a phenomenon of "out group homogeneity," apparently untested in jury work, does not establish that a jury, properly instructed, and sworn to do its grave duty, would not do it. Finally, both Mahaffey brothers acted together and even in the absence of Reginald Mahaffey as a defendant, the jury would have heard a great deal of argument about the Mahaffeys.

### The Jury

#### A. *Witherspoon*

■ Patricia Botta was a prospective juror. When she was asked if she had any conscientious religious or moral scruples against the death penalty, she responded "I would not be for it, sir." When asked whether there were any circumstances under which she would sign a death penalty verdict, she answered "I really don't believe I could." Judge Hett thought the matter required further inquiry and put the issue in a more concrete way.

> I would be giving instructions concerning the criteria or standards that a jury is to follow or consider in coming to conclusion as to whether a case is appropriate for the death penalty. Would you be able to follow those instructions in arriving at a verdict unanimously with eleven other jurors?

Patricia Botta said

> I don't really know how to answer that, you know, because my feelings are definitely—I don't think I could really live with the situation.

Judge Hett excused the juror.

■ General objections to the death penalty are not grounds for judicial removal of a juror; only those views which would prevent or substantially impair a juror's ability to fairly consider the appropriateness of the death penalty in the case to be tried. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

■ ▪ The decision whether this is true of a particular juror is remitted to the trial judge who sees and hears the juror answer the questions on voir dire. *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). There is nothing in the record to suggest the trial judge acted unreasonably in his judgment. He would have been within his rights to excuse Patricia Botta when she said "I really don't believe I could [sign my name to a death penalty verdict]." He went further to be sure he understood the juror's true position, and she confirmed that she did not think she "could live with the [decision in the death penalty]". Judge Hett presided over jury selection with great care, and Patricia Botta was properly excused.

### B. *Batson*

■ Jerry Mahaffey charges that prosecutors excused jurors (except for the first alternate) simply because they were black. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The same claim was made on direct appeal.

*Batson* was decided during the course of this case, while the case was on appeal. The Illinois Supreme Court remanded for a hearing and, after considering the trial court's ruling, rejected the claim.

■ In *Batson*, the Court provided for a two-step hearing to determine whether there is discrimination against black jurors. The first was to determine whether there was a prima facie case. The purpose of this requirement was, at bottom, an attempt to keep some faith with the idea of the peremptory challenge, a right of a party to excuse a juror without explanation. The Court would require explanation only after a reason to require one had been shown. *See Swain v. Alabama*, 380 U.S. 202, 209–28, 85 S.Ct. 824, 830–41, 13 L.Ed.2d 759 (1965). In *Swain*, the requirements for making a prima facie case were set quite high. In *Batson*, the Court lowered the requirements. It still left with the trial judge the decision whether a prima facie case had been made. Unlike employment cases,[20] there is no formula for determining the prima facie case under *Batson*. The Court said

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson v. Kentucky*, 476 U.S. at 96–97, 106 S.Ct. at 1723; *see also United States v. Armstrong*, 517 U.S. 456, ——, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996); *J.E.B. v. Alabama*, 511 U.S. 127, 145–47, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994).

The Court declined "to formulate particular procedures to be followed upon a defendant's timely objection." *Batson*, 476 U.S. at 99, 106 S.Ct. at 1724–25. The two-stage procedure suggested by the court—prima facie proof followed by explanation followed by a ruling on whether purposeful discrimination has been proved is sometimes followed but often is not. Assessing a prima facie case requires painstaking consideration of all relevant circumstances, while assessing the validity of a race-neutral explanation may simply require a determination of a prosecu-

**20.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

tor's credibility as to a particular challenge. In many cases, the prosecutor simply offers an explanation in response to an objection which makes the prima facie case decision unnecessary. *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

Jerry Mahaffey's counsel argued that the prima facie case was made because, he said, prosecution excused all seven blacks presented for non-alternate positions and also exercised the majority of its thirteen challenges against blacks, seven to six.

In this case, the prosecutors elected to dispute the showing of the prima facie case though they did explicitly deny basing challenges on race. The detailed explanation they did offer was directed to explaining the pattern of challenges. The Assistant State's Attorney said

> In the jury selection process, the choice of whether or not to choose or challenge a juror was dependent upon a combination of factors. Some ... are readily apparent from the record. Other reasons are not [which] included our personal experiences, our knowledge of the case, our knowledge as trial lawyers, our gut instincts, our first glance impressions of the jurors as they sat in that chair.... [W]e used a sliding scale of scrutiny ... reasons which may have existed at the very beginning of this jury selection may have been amended, excluded, or changed due to the composition of those already selected, the number of challenges used or the overall totality of the circumstances surrounding that individual juror's background.... What may have been a primary reason to exclude early on in the jury selection may not have been of much importance later on, even though two jurors may have shared that individual trait.

The prosecutor also noted that they declined to use available peremptories against a black alternate and exercised them against whites and that given the length of the proceeding and the presence of only two alternates, it seemed likely then that the alternate would sit.

The prosecutor then recited the details of jury selection and the order of challenges. He then noted various reasons for challenges apparent in the record, e.g., unwillingness to follow instructions, reluctance (not amounting to cause disqualification) to impose the death penalty, occupation, prior experience with police, youth, reluctance to consider penalties other than death, reluctance to serve on the jury and prior knowledge of the case. All of these reasons he noted were used to exercise challenges against both white and black jurors.

In response, Mahaffey's counsel pointed out that while the prosecution did apply its reasons to both white and black jurors, it left on the jury some white jurors who had the same sort of characteristics as excused black jurors, e.g., reluctance to serve because of sequestration, being a crime victim. He also expressed doubt about the sincerity of a prosecution challenge to someone whose problems with the law would have caused them to be unfair to defendants.[21]

Judge Hett began by noting that he doubted the prosecutor would be the sort of person who would practice discrimination. The heart of his ruling was his detailed analysis of the jury selection process, one in which he, rather than counsel, put questions to the venire. His pattern of questioning was standard and made without regard to race. The determination of the existence of a prima facie case is a factual question, and there is no reason to doubt the correctness of Judge Hett's findings. Absolute consistency in peremptory challenges is not required, and prima facie determinations have to be made on the totality of the circumstances. This is not to say that Judge Hett could not have decided the question the other way, but on this record, given his participation in the jury selection, his judgment that there was no prima facie case was permissible.[22]

---

21. In this proceeding, Jerry Mahaffey seems to abandon the argument against peremptories excusing jurors for reluctance to serve, but he adds one that I do not find was made at trial, that the prosecution inconsistently applied its standards regarding juror's occupations.

22. The claim that Judge Hett's conclusion was based in part upon his assessment of one prose-

The Supreme Court of Illinois affirmed this finding and observed the trial judges "are familiar with local conditions and prosecutors and can draw upon their power of observation and judicial experience as a guide in distinguishing a true case of discrimination from a false one." Just so.

The Petition for Writ of Habeas Corpus is denied.

cutor's character is not persuasive. Neither the rhetoric of the ruling nor its logic would suggest this to be so. There was one other prosecutor, indeed the lead prosecutor in the case, about whom Judge Hett explicitly said he would express no views at all. Had he rested his conclusion on the character of the prosecutors, he would have had to discuss the lead prosecutor as well.