Jerry **MAHAFFEY, Petitioner–Appellant,**

v.

Thomas **PAGE, Warden, Respondent–Appellee.**

No. 97–4137.

United States Court of Appeals, Seventh Circuit.

Argued May 5, 1998.

Decided Aug. 6, 1998.

Alan M. Freedman, Gary Prichard (argued), Midwest Center for Justice, Ltd., Chicago, IL, for Petitioner–Appellant.

Deborah L. Ahlstrand, Office of Attorney General, Civil Appeals Division, Chicago, IL, Renee G. Goldfarb (argued), Office of State's Attorney of Cook County, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before CUMMINGS, FLAUM, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Jerry Mahaffey was convicted by an Illinois jury in 1985 of two counts of murder, along with one count each of attempted murder, aggravated battery, home invasion, rape, armed robbery, residential burglary, and theft. For these crimes, he was sentenced to death. On direct review, the Illinois Supreme Court affirmed his conviction and sentence, 128 Ill.2d 388, 132 Ill.Dec. 366, 539 N.E.2d 1172 (1989), and the United States Supreme Court denied his petition for certiorari, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 799 (1990). Mahaffey's state petition for post-conviction relief was similarly unsuccessful. See 165 Ill.2d 445, 209 Ill.Dec. 246, 651 N.E.2d 174 (1995), cert. denied, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). He then filed this petition for federal habeas corpus relief,[1] which the district court denied. See United States ex rel. Mahaffey v. Peters, 978 F.Supp. 762 (N.D.Ill.1997). Mahaffey now appeals the denial of the writ on a number of grounds rejected by the district court, and we affirm.

I.

Jerry Mahaffey, along with his brother Reginald, drove to Chicago's North Side on the night of August 29, 1983 to burglarize a clothing store. The Mahaffey brothers aborted that plan at some point, and they instead chose to climb through an open window and into the apartment of Jo Ellen and Dean Pueschel. The Pueschels, along with their then-eleven-year old son Richard, were asleep at the time. After Reginald picked up a knife from the kitchen, the brothers first entered Richard's bedroom and proceeded to stab him with the knife and hit him over the head with a baseball bat that was in the bedroom. Reginald picked up a bat as well, and the brothers next proceeded into the Pueschels' bedroom, where they began to hit Dean Pueschel on the head with their bats.

1. Mahaffey filed his petition on November 14, 1995. Therefore, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) do not apply to this case. See Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Jo Ellen was taken to another room, where she was raped and sodomized; at some point Jerry saw Dean Pueschel attempt to draw a gun in self-defense, so Jerry hit Dean over the head again with his bat. When both brothers went back into the Pueschels' bedroom to retrieve firearms that they had discovered, they saw Dean begin to move and stabbed him to death. Jo Ellen was taken out to the Pueschels' car, where she was forced to disarm the car's alarm system; she was then taken back into the apartment and beaten in the head with the butt of a pistol, which caused her death. This last beating occurred in Richard's presence, who had regained consciousness by this point. Jerry wiped down the fingerprints on everything that he and Reginald had touched in the apartment. Leaving Richard for dead, the brothers fled in the Pueschels' car, taking with them jewelry, guns, and video equipment that they had stolen. Richard survived the attack and was discovered by his grandfather the next day, dazedly wandering in the alley near his parents' home.[2]

After receiving information from the Mahaffeys' brother, Cedric, police arrested both Jerry and Reginald. They confessed to authorities, and following a joint trial at which only Reginald testified, both Jerry and Reginald were convicted and sentenced to death.[3] Jerry Mahaffey's conviction and sentence were affirmed on appeal and state post-conviction review, and he now raises four arguments on appeal of the district court's denial of habeas corpus relief. First, he argues that the prosecution's exercise of its peremptory challenges at trial violated his Fourteenth Amendment rights. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Next, Mahaffey argues that the prosecutor's closing argument at the sentencing hearing falsely implied that Mahaffey could receive a sentence less than natural life imprisonment if the jury refused to impose the death penalty. Mahaffey as-

serts that this misrepresentation violated his rights under the Eighth and Fourteenth Amendments. His third and fourth arguments assert that he received ineffective assistance from his trial counsel both at the sentencing hearing and in arguing a motion to suppress his confession. We will relate additional facts relevant to these arguments in the context of our discussion.

## II.

### A. Batson *Challenge*

■ While Mahaffey's case was pending in the Illinois courts on direct review, the Supreme Court held in *Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that a prosecutor's discriminatory use of peremptory challenges on the basis of race could violate a defendant's right to equal protection under the Fourteenth Amendment. Evaluation of a *Batson* claim entails a three-step process. *See id.* at 96; 106 S.Ct. 1712. First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges on the basis of race. If the defendant satisfies this threshold, the burden then shifts to the prosecution to articulate a race-neutral justification for the disputed challenges. If a race-neutral explanation is tendered, the court then must determine whether, in light of the proffered justification, the defendant has satisfied his burden of proving purposeful discrimination. *See id.* at 96–98, 106 S.Ct. 1712; *see also Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *McCain v. Gramley*, 96 F.3d 288, 290 (7th Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997).

*Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), subsequently held that *Batson* applied retroactively, and the Illinois Supreme Court therefore directed the trial court in Mahaffey's case to conduct

---

**2.** For a more detailed account of the facts of this crime, *see People v. Mahaffey*, 128 Ill.2d 388, 132 Ill.Dec. 366, 539 N.E.2d 1172 (1989).

**3.** The Illinois Supreme Court reversed Reginald's conviction on direct appeal, holding that his case should have been severed in light of Jerry's confession and the fact that Jerry did not testify at

trial, which deprived Reginald of the ability to cross-examine his brother. *See People v. Mahaffey*, 128 Ill.2d 388, 132 Ill.Dec. 366, 539 N.E.2d 1172, 1183 (1989). On retrial, Reginald was again convicted and sentenced to death. *See People v. Mahaffey*, 166 Ill.2d 1, 209 Ill.Dec. 607, 651 N.E.2d 1055 (1995).

a hearing to determine whether the prosecution had violated the Fourteenth Amendment in employing its peremptory challenges. Mahaffey, who is black, argued that the prosecution violated *Batson* when it exercised peremptories on all seven of the black veniremen who were considered for Mahaffey's petit jury. *See* 132 Ill.Dec. 366, 539 N.E.2d at 1175. The trial judge found that Mahaffey could not establish a prima facie case of discrimination under *Batson*. The Illinois Supreme Court affirmed this finding, *see* 132 Ill.Dec. 366, 539 N.E.2d at 1185, as did the district court below, *see* 978 F.Supp. at 781–82. Mahaffey argues that the district court erred in holding that he failed to establish a prima facie case, and he further argues that he has established a case of purposeful discrimination under *Batson* that entitles him to a writ of habeas corpus. We reject this argument and affirm the district court's holding, though we employ a different analysis than the courts that previously have addressed Mahaffey's *Batson* claim.

1. Facts Relating to the *Batson* Claim

At the selection of Mahaffey's jury, seven black veniremen were presented for non-alternate seats following challenges for cause. The State, which was given a total of 24 peremptory challenges (Jerry and Reginald Mahaffey were given 12 each), exercised a peremptory on each of the seven black veniremen presented for the jury, and also on six white veniremen. Mahaffey's trial counsel moved to dismiss the venire each time the prosecution struck a black venireman, arguing that the prosecution was improperly excluding blacks from the jury. This motion was renewed at the conclusion of *voir dire*, which had produced a jury composed of eleven white jurors and one Asian juror.[4] The trial judge, who had posed all of the questions to the potential jurors during the *voir dire*, expressed concern regarding the prosecution's use of its peremptories and invited the prosecution to come forward with race-neutral justifications for its exercise of

peremptories. The prosecution declined to do so, as it was entitled to do prior to *Batson*, and the court denied Mahaffey's motion to dismiss the venire.

While Mahaffey's appeal was pending in the Illinois Supreme Court, that court ordered the trial judge, Thomas Hett, to conduct a *Batson* hearing to address Mahaffey's claim that the prosecution had discriminated in exercising its peremptory challenges. In accordance with the procedures outlined in *Batson*, *see* 476 U.S. at 96–98, 106 S.Ct. 1712, Judge Hett was directed to permit Mahaffey to present evidence in support of his claim of unconstitutional discrimination and, if the court found that Mahaffey had established a prima facie case of discrimination, to require the prosecution to produce race-neutral justifications for the questioned challenges. *See* 132 Ill.Dec. 366, 539 N.E.2d at 1175. In support of his claim that the evidence established a prima facie case under *Batson*, Mahaffey emphasized that, following dismissals for cause, the prosecution used its peremptory challenges to remove all of the black veniremen presented for service on the jury. In addition, he argued that the fact that the prosecution had exercised a majority of its peremptory challenges—by a seven to six margin—on black veniremen further established a prima facie case. Further, Mahaffey pointed out that during the *voir dire* Judge Hett had asked the prosecution to explain the reasons for its use of its peremptory challenges. Mahaffey argued that Judge Hett's concern was itself indicative of a prima facie case.

In response, Assistant State's Attorney Paul Tsukono[5] first argued that Mahaffey had not established a prima facie case. In this regard, the prosecution pointed out that it had accepted a black woman to serve as an alternate juror, which it believed served to refute Mahaffey's discrimination claim. Further, the prosecution noted that, including the two peremptory challenges that it exercised in selecting alternate jurors, a majority

---

4. The prosecution also had two peremptory challenges in the selection of alternate jurors. It exercised both of them on white veniremen, and a black venireman was subsequently seated as an alternate.

5. Tsukono had earlier participated in both the jury selection and prosecution of Mahaffey's case.

of its peremptories had been directed towards white veniremen—by an eight to seven margin.

The Assistant State's Attorney then proceeded to offer non-discriminatory reasons for the prosecution's exercise of its peremptories. Tsukono prefaced his analysis: "Now, the People's challenges against the minority jurors can be examined from two bases, I suggest individually and collectively. I suggest that there are reasons which are revealed from the *voir dire*, reasons which are apparent from the record which justify the State's challenges against these minority jurors." The prosecutor then proceeded to describe the justifications for exercising peremptories against the stricken black veniremen, and he tied these justifications to each of them individually. Some prospective jurors, for example, demonstrated an unwillingness to impose the death penalty, even though they had not been stricken for cause; some had also demonstrated an unwillingness or an inability to follow instructions. The prosecution also noted that it had exercised peremptories on the bases of occupation, youth, prior experience with the police, reluctance to serve on the jury, and prior knowledge of the Pueschels' murders. All of these justifications, the prosecution stated, had been used to strike both black and white veniremen. Tsukono also noted that, in light of the evolving nature of the jury selection process, the prosecution

> used a sliding scale of scrutiny in the determination of whether or not a juror would be chosen or excluded. Reasons which may have existed at the very beginning of this jury selection may have been amended, excluded, or changed due to the composition of those already selected, the number of challenges used and the overall composition, or the overall totality of the circumstances concerning that individual juror's background.

The prosecutor then concluded his argument by asserting that Mahaffey had not made a prima facie showing under *Batson*.

In rebuttal, Mahaffey's counsel argued that the prosecution had not only argued against a prima facie showing, but that it had offered its nondiscriminatory justifications as well. He stated, "I believe, your Honor, the prosecutor has crossed over from the first stage into the second stage and has offered a great deal of explanation on why there was in fact no exclusion of Blacks on grounds of race." Mahaffey's counsel then argued that at least some of the prosecution's asserted justifications were pretextual. For example, while the prosecution asserted that reluctance to serve on the jury had been a justification for some of its peremptory dismissals, Mahaffey's counsel argued that other white jurors whom the prosecution had not dismissed had expressed a similar reluctance to serve. Other asserted justifications were also pretextual, Mahaffey's counsel argued, or were not applied consistently by the prosecution to the black and white members of the venire. Mahaffey's counsel concluded by stating that Mahaffey had established a prima facie case, though he requested further opportunity to respond to the prosecution's proffered non-discriminatory justifications.

Judge Hett, in announcing his decision, indicated that he had made a "detailed analysis of the jury selection process" by reading and taking notes regarding the entire transcript of the *voir dire* (which had spanned seven days), along with copies of the jury cards for all of the prospective jurors. In explaining his own detailed analysis, Judge Hett noted that personal characteristics (which the prosecution had not proffered as its race-neutral justifications), such as gender, home ownership, and marital status, were similar in comparing the eight white veniremen who were stricken (including alternates) with the seven black veniremen who were stricken. He further noted that those individuals seated on the jury did not differ significantly from those who were stricken with respect to these characteristics. He concluded, "all of the people who were excused were similar to the people who were chosen. The Whites who were excused were similar to the Blacks who were excused."

At this point, Judge Hett went on to consider the potential jurors' responses to his *voir dire* questioning in light of the prosecution's asserted non-discriminatory justifications. With respect to willingness to impose the death penalty, for example, Judge Hett

found that "where there was any question raised by the juror as to penalty, ... there were four Whites and two Blacks who were excused by the State." Of the veniremen who had previously been accused of crimes, Judge Hett identified two white !and one· black veniremen, all ·of whom were stricken.[6] In conclusion, Judge Hett noted that, looking at the totality of the circumstances, "I do not believe that there has been a showing, a prima facie showing that the State exercised their challenges in a manner that showed racial discrimination. They treated both the Blacks and the Whites who were being excused in· the same way. It is apparent in the record that they used the same factors that I found as to Whites, again as to Blacks." Judge Hett therefore concluded that Mahaffey had failed to establish a prima facie case under *Batson*.

## 2. Discussion

■ Mahaffey argues that the lower courts erred in failing to recognize that he established a prima facie case. Further, he asserts that, notwithstanding the trial court's

finding that he had not established an inference of discrimination, the prosecution tendered its race-neutral justifications to the court, and that these justifications are pretextual. Accordingly, Mahaffey asks us to reverse the district court and grant him relief on his *Batson* claim.

It is true that Judge. Hett couched his decision in the context of whether Mahaffey had established a prima facie case. Moreover, the Illinois Supreme Court grounded its analysis in the context of whether, considering "all relevant circumstances," the trial court's prima facie case determination was against the manifest weight of the evidence. *See* 132 Ill.Dec. 366, 539 N.E.2d at 1184. The district court similarly rejected Mahaffey's claim on the basis that there was no reason to doubt the correctness of Judge Hett's factual finding regarding the existence of a prima facie case. *See* 978 F.Supp. at 781. It is also true, however, as should be. apparent from our lengthy recitation of the *Batson* hearing proceedings, that the State provided its race-neutral justifications for the use of its peremptory challenges.[7] This fact

---

**6.** The dissent expresses the view that, "rather than comparing the excused African–Americans to the excused whites, ... the trial judge should have been comparing the excused African–Americans to the whites who remained, for only through such a comparison could the judge assess whether race played any role in the State's challenges." *Post* at 693. While this observation is substantively cogent, we respectfully suggest that the trial judge proceeded in the fashion that the dissent would prescribe. As evidenced *supra*, Judge Hett's underlying inquiry reveals that he indeed considered the State's justifications with respect to the entire venire.

**7.** In both its brief to this Court and at oral argument, the State contended that it never has offered race-neutral justifications for its peremptory challenges, solely because Mahaffey never has established a prima facie case of discrimination. This contention is clearly wrong factually, as Assistant State's Attorney Tsukono offered at the *Batson* hearing "reasons which are apparent from the record which justify the State's challenges against these minority jurors." Tsukono then discussed five of the seven stricken black veniremen individually, discussing justifications such as a hesitancy regarding imposition of a death sentence,· or problems in following the court's instructions.· Further, he discussed justifications that applied to more than one venireman, such as a prior knowledge of the case, or a previous suspicion of criminal activity. These collective justifications applied to the two strick-

en black veniremen that Tsukono had not discussed individually, in addition to the five veniremen that he had previously discussed.

The State's legal justification for its position is essentially that, because it was not *required* under *Batson* to proffer race-neutral justifications until Mahaffey established his prima facie case, it necessarily *could not* have furnished those justifications before a prima facie case was established. This attributes far more significance to *Batson's* evidentiary burden-shifting approach than it deserves. In *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), on which the prosecution relies, the Supreme Court addressed a case in which the prosecutor justified his peremptory challenges before the trial court could decide whether a prima facie case had been established. A plurality of the Court recognized that "[t]his departure from the normal course of proceeding need not concern us.... '[W]here the [prosecutor] has done everything that would be required of him if the [defendant] had properly made out a prima facie case, whether the [defendant] really did ṣo is no longer relevant.'" *Id.* at 359, 111 S.Ct. 1859 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103·S.Ct. 1478, 75 L.Ed.2d 403 (1983)). This is because, as the Supreme Court has recognized in the related context of Title VII's burden-shifting approach, the prima facie case method was "never intended to be rigid, mechanized, or ritualistic. Rather, it

was recognized by Mahaffey's counsel at the *Batson* hearing, *see supra* at 677, and by the Illinois Supreme Court, *see* 132 Ill.Dec. 366, 539 N.E.2d at 1181 ("Finally, the State gave its criteria for challenging the seven black veniremen, asserting that the criteria were applied to all veniremen, without regard to race.").

A plurality of the Supreme Court recognized in *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), that when a prosecutor offers race-neutral explanations for peremptory challenges and the trial court rules on the ultimate question of intentional discrimination, the issue of whether the defendant had satisfied his prima facie burden becomes moot. *See id.* at 359, 111 S.Ct. 1859. This Circuit has followed that approach. *See McCain v. Gramley*, 96 F.3d 288, 292 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997); *United States v. Cooper,* 19 F.3d 1154, 1160–61 (7th Cir.1994); *see also Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir.1997) (following the same approach), *cert. denied*, —— U.S. ——, 118 S.Ct. 102, 139 L.Ed.2d 57 (1997); *Johnson v. Love*, 40 F.3d 658, 663–64 (3d Cir.1994) (same); *United States v. Johnson*, 941 F.2d 1102, 1108 (10th Cir.1991) (same). This approach makes good sense, in light of the fact that the ultimate question always remains whether the opponent of the strike has satisfied the burden of persuasion regarding purposeful discrimination. *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

While Mahaffey makes a strong argument that he established a prima facie showing, we need not consider this issue, as the prosecution bypassed this stage by proffering its non-discriminatory reasons. It is evident from the *Batson* hearing transcript that Judge Hett considered the prosecution's justifications and concluded, in light of the "totality of the circumstances," that the prosecution had not exercised its peremptory challenges in a racially discriminatory manner. Assistant State's Attorney Tsukono provided justifications, such as an unwillingness to impose the death penalty, an inability to follow instructions, or a prior run-in with the police. Judge Hett conducted his own "detailed analysis" of the *voir dire* and discussed the State's justifications in the context of its use of peremptory challenges at *voir dire*. With respect to these justifications, Judge Hett found that the State's dismissals transcended racial lines. In conjunction with his knowledge and recollection of the *voir dire* (at which he had expressed concern regarding the prosecution's use of its peremptories), as well as his prior interactions with Tsukono as a prosecutor—the totality of the circumstances—Judge Hett concluded that Mahaffey had not established purposeful discrimination. The fact that the judge couched his finding in the context of a "prima facie showing" is of no consequence. Evidence that is insufficient to establish even an inference of discrimination is certainly not sufficient to meet the opponent of the strike's ultimate burden of persuasion in proving purposeful discrimination. *See McCain*, 96 F.3d at 293. The trial judge considered all of the evidence that was available to him, along with his personal recollections regarding the prosecution's demeanor and approach at the *voir dire*. Indeed, in light of the concerns he expressed at *voir dire*, the judge conducted a painstaking, thoroughly detailed analysis, and only then concluded that Mahaffey was unable to establish discriminatory motive on the part of the prosecution.

is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

Regardless of whether the State was required to provide its race-neutral justifications at the *Batson* hearing, it certainly did so. The State's assertion that it did not provide those justifications simply because it was not required to do so lacks any foundation in precedent or in fact.

This error in analysis is borne out by the district court's recognition that "[i]n many cases, the prosecutor simply offers an explanation in response to an objection which makes the prima facie case decision unnecessary." 978 F.Supp. at 781. Moreover, as Mahaffey suggests, the implication that the State could develop *new* justifications at this late date, after the State has already provided justifications for its challenges, would serve to pervert *Batson's* burden-shifting framework.

A trial court's decision on the ultimate question of discriminatory intent constitutes a finding of fact that we review with great deference on appeal. *See Hernandez,* 500 U.S. at 364, 111 S.Ct. 1859; *id.* at 372, 111 S.Ct. 1859 (O'Connor, J., joined by Scalia, J., concurring in the judgment). On federal habeas review, the factual findings of a state trial court "shall be presumed to be correct." 28 U.S.C. § 2254(d) (1994); *see also Splunge v. Clark,* 960 F.2d 705, 708 (7th Cir.1992). Aside from the statutory command of § 2254(d) in this context, deference to the trial court on the issue of discriminatory intent makes good sense, as the Court recognized in *Hernandez:*

> [T]he finding largely will turn on evaluation of credibility. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.

500 U.S. at 365, 111 S.Ct. 1859 (quotations and citations omitted). Unlike an appellate court, which must rely solely on a paper record, the trial court is in a unique position to review the credibility and demeanor of both the attorneys and the prospective jurors. *See, e.g., United States v. Cooper,* 19 F.3d 1154, 1161 (7th Cir.1994).

As we have discussed, Judge Hett considered in detail the prosecution's race-neutral justifications, conducted his own analysis regarding whether any of these justifications were pretextual, and concluded that Mahaffey had not shown racial discrimination. Moreover, the Illinois Supreme Court fully considered the trial court's treatment of the *Batson* hearing and concluded: "The record shows that the trial judge used his experience, as well as his superior knowledge of

local conditions and prosecutors, in determining that the State's peremptory challenges were not motivated by impermissible racial-group bias. We see no reason to disturb this finding." 132 Ill.Dec. 366, 539 N.E.2d at 1185. We are similarly unaware of any reason to disturb the presumption of correctness that we are statutorily required to accord the state court's factual finding. *See, e.g., Pitsonbarger v. Gramley,* 141 F.3d 728, 734 (7th Cir.1998), *petition for cert. filed,* —— U.S.L.W. —— (U.S. July 8, 1998) (No. 98–5153). We therefore reject Mahaffey's *Batson* claim.

### B. Prosecutorial Misconduct at Mahaffey's Sentencing Hearing

#### 1. Facts

Mahaffey testified in his own behalf at his sentencing hearing. The prosecution's questioning of Mahaffey revealed that, while he was awaiting trial, he had participated in an armed escape from the Cook County jail and had been apprehended two days later. When asked whether he would attempt to escape again, Mahaffey replied, "I don't know."

During his closing argument, Mahaffey's counsel repeatedly requested the jury to resist imposing a death sentence so that Mahaffey could instead spend the rest of his life in prison.[8] Mahaffey's counsel posed this request to the jury on five occasions in his closing argument, making comments such as: "That is why I am here now, still pleading with you not to let Jerry free but to live the rest of his life in the penitentiary, not as a free man, as a prisoner, but still a man." In response, the prosecutor argued to the jury:

> When they tell you that they will spend the rest of their lives in prison, there is no guarantee. There is no guarantee, ladies and gentlemen, not only because of what the law may say but because of what you heard from the witness stand.

The prosecutor further told the jury that, if it did not sentence the Mahaffey brothers to death, "You will be letting them go because

---

**8.** Under Illinois law, a mandatory sentence of life imprisonment without the possibility of parole (or "natural life") was the only alternative to a death sentence in this case, because Mahaffey had been convicted of murdering two people. *See* 730 Ill Comp Stat. 5/5–8–1(a).

you will be turning your back on the law and justice. They will be let go." Mahaffey requested that the trial judge instruct the jury that if it did not sentence him to death, the court was required by statute to sentence him to a term of life without parole. The court, however, refused to give this instruction.

2. Discussion

 Mahaffey appears to make two related due process arguments in this context. We review these claims de novo, the standard of review that prevailed before the AEDPA became effective. *See, e.g., Abrams v. Barnett,* 121 F.3d 1036, 1038 (7th Cir. 1997). His first argument relies upon the prosecutor's comment that there was "no guarantee" that Mahaffey would spend the rest of his life in prison "not only because of what the law may say," along with his comment that, if the jury failed to impose the death penalty, Mahaffey "will be let go." Mahaffey contends that these statements implied that, by law, he could at some point in the future be released or paroled from prison. Relying on our opinion in *Del Vecchio v. Illinois Department of Corrections,* 31 F.3d 1363, 1385 (7th Cir.1994) (en banc), *cert. denied,* 514 U.S. 1037, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995), he argues that this implication "raise[s] the possible inference that there was a 'careless or designed pronouncement of sentence on a foundation [that was] extensively and materially false.'" *Id.* (quoting *Townsend v. Burke,* 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)).

The prosecution's comment that "there is no guarantee ... because of what the law may say," is subject to a number of differing interpretations. Both the Illinois Supreme Court and the district court below construed the prosecution's comment to refer to Mahaffey's previous escape from jail and his response that he did not know whether he would attempt to escape again. *See* 978 F.Supp. at 778; 539 N.E.2d at 1192. Further, the district court stated that the "argument that anything less than the death penalty will be a letting go of defendant was nothing more or less than a comment that the death penalty was the only just and legally correct sentence." 978 F.Supp. at

778. This is a reasonable interpretation of this disputed comment. Even if we were to disregard these reasonable interpretations of the prosecution's comments and accept those asserted by Mahaffey, as in *Del Vecchio,* "this would not be enough to overturn the death sentence." 31 F.3d at 1385. The prosecution's contested statements were not "extensively and materially false," as the prosecution never explicitly stated that Mahaffey could be eligible under Illinois law for parole or release. *See id.* (quoting *Townsend,* 334 U.S. at 741, 68 S.Ct. 1252). Further, in light of the evidence of Mahaffey's prior escape and his equivocal response at the sentencing hearing regarding future escape attempts, the jury already was aware of the risk that, at some point in the future, Mahaffey could be loosed upon the public. It is accordingly "questionable whether the jury relied on [the contested statements] in its 'pronouncement of sentence.'" *See id.* Because Mahaffey has not established that the challenged statements were inaccuracies of "constitutional magnitude," *see United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), we reject this formulation of his due process challenge.

 Mahaffey's second related argument incorporates into the above analysis the fact that the trial court refused to allow him—either through argument or an instruction—to explain to the jury that the only alternative to a death sentence was a sentence of natural life. Mahaffey argues that the prosecution's implication that Mahaffey could ultimately be released from prison and pose a threat to society, combined with Mahaffey's inability to inform the jury of the only statutory alternative, served to deprive him of due process. This argument evokes the rule of *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). *Simmons* held that when the prosecution argues to a capital defendant's sentencing jury that the defendant represents a future danger, the defendant must be permitted to inform the jury that he would not be eligible for parole, so long as the only statutory alternative to a death sentence is imprisonment without possibility of parole. *See id.* at 169, 114 S.Ct. 2187; *id.* at 177, 114 S.Ct. 2187

(O'Connor, J., concurring in the judgment). Wisely, Mahaffey does not explicitly rely on *Simmons* in his briefs to this Court. That is because *O'Dell v. Netherland,* 521 U.S. 151, —— – ——, 117 S.Ct. 1969, 1977–78, 138 L.Ed.2d 351 (1997), held that *Simmons* announced a new rule within the meaning of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); our Circuit had previously reached this same conclusion in *Stewart v. Lane,* 60 F.3d 296, 299–303 (7th Cir. 1995), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2580, 135 L.Ed.2d 1095 (1996). The fact that Mahaffey does not explicitly rely on *Simmons,* however, does nothing to alter *Teague's* principle of the nonretroactivity of new rules. Mahaffey's conviction became final in 1990, when the Supreme Court denied certiorari on direct review. He therefore cannot benefit from the rule of *Simmons,* which the Court announced in 1994. Thus, we reject this variant of his due process claim as well.

### C. · Ineffective Assistance of Trial Counsel

■ Mahaffey argues that his trial counsel, Steven Decker, provided ineffective assistance in two ways. First, he argues that Decker failed to investigate and introduce evidence at a pretrial suppression hearing regarding Mahaffey's confession. Second, he argues that Decker failed to investigate and introduce potentially mitigating evidence at his sentencing hearing. To prevail on either of these claims, Mahaffey must satisfy the familiar standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test requires him to demonstrate both deficient performance by his trial counsel and prejudice as a result of the deficiency. *See id.* at 694, 104 S.Ct. 2052.

■ In order to establish deficient performance, a defendant must demonstrate that he has been denied his Sixth Amendment right to a fair trial as the result of the incompetence of defense counsel. *See, e.g., Eddmonds v. Peters,* 93 F.3d 1307, 1313 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S.

at 687, 104 S.Ct. 2052. In this context, we do not second-guess defense strategies that were sound or reasonable at the time of the trial simply because they ultimately proved unsuccessful. Rather, "[c]ounsel must contest the prosecution's case ·and advance a good defense; if that role has been fulfilled, a writ of habeas corpus should not issue." *Holman v. Gilmore,* 126 F.3d 876, 882 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998).

■ To establish prejudice under *Strickland,* a defendant must satisfy a similarly high threshold. "[A] criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052); *see also Eddmonds,* 93 F.3d at 1313 ("Prejudice in the *Strickland* sense refers to 'unprofessional errors' so egregious 'that the trial was rendered unfair and the verdict rendered suspect.'") (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). In the context of ineffective assistance at the penalty phase of a capital case, we have noted that prejudice requires a showing "that a reasonable probability exists that, but for counsel's substandard performance, the sentencer 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Hall v. Washington,* 106 F.3d 742, 749 (7th Cir.1997) (quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052), *cert. denied,* —— U.S. ——, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997). Reviewing Mahaffey's claims *de novo,* we conclude that neither of them can satisfy the above standards.

### 1. Ineffective Assistance at the Suppression Hearing

■ Mahaffey raised two arguments at his pretrial suppression hearing. First, he argued that he did not understand the *Miranda* warnings that were. given to him by the police, and therefore he did not knowingly and intelligently waive his right to counsel prior to confessing. Second, he argued that he was physically coerced into giving this

confession because he was "brutalized" by the police. Mahaffey's wife corroborated his account. She stated that when police came to Mahaffey's apartment to arrest him she was ushered outside; while outside, she heard her husband screaming and the sounds of furniture being thrown around. In an attempt to explain away the confession's detailed recitation of the facts surrounding the Pueschels' murders, Mahaffey contended that police spoon-fed him the details of the crime over a period of two hours following his arrest. His twenty-page confession, Mahaffey testified, was the result of his memorizing information that had been provided to him by the police.

Mahaffey now argues that Decker, his trial counsel, provided ineffective assistance at the suppression hearing by failing to have Mahaffey examined by a clinical psychologist. Mahaffey's counsel at the state post-conviction stage did have Mahaffey examined by a psychologist, Dr. Harry Gunn, who concluded that Mahaffey was mildly retarded, could barely read, and most likely could not have understood his *Miranda* rights when they were given to him. Mahaffey asserts that there is a reasonable probability that his confession would have been suppressed if this testimony had been presented, and that the outcome of his trial would have been different if the statement had been suppressed.

Decker submitted responses to written interrogatories in connection with an evidentiary hearing conducted in the district court to address Mahaffey's ineffective assistance claims. In response to questions about the advisability of presenting evidence of mental retardation at the suppression hearing, Decker stated that he never "discerned anything whatsoever that [Mahaffey] was unable to read." Further, Decker thought that such evidence would be questionable "given [Mahaffey's] written statements and my other knowledge as to his abilities to understand and communicate." Decker's impression of Mahaffey's cognitive abilities is buttressed by the perception of others; Mahaffey's sister described him as someone who "presented himself as though he had all this knowledge." The district court judge,

who observed Mahaffey and heard him testify at the evidentiary hearing held in connection with Mahaffey's ineffective assistance claims, also commented on the impression Mahaffey made:

[I]f the Jerry Mahaffey I saw in 1997 is like the Jerry Mahaffey that Steven Decker saw in the mid-1980s, then Decker is not to be faulted for failing to consider mental retardation. Prior to his arrest Mahaffey was employed full time, living with his family and reasonably capable of holding his own under examination.

978 F.Supp. at 770. At the time of the suppression hearing, there was no reason to question Mahaffey's mental abilities, and we cannot say that Decker's failure to pursue such psychological evidence amounted to "gross incompetence."

■ In the context of Mahaffey's physical coercion argument, Mahaffey argues that Decker provided ineffective assistance by not interviewing and presenting the testimony of Mahaffey's neighbor, Charles Patterson. Patterson would have testified that he heard screaming, thuds, and other similar sounds coming from Mahaffey's apartment at the time of the arrest that suggested that someone was being beaten. Opposing Mahaffey's physical coercion argument, the prosecution presented testimony of Mahaffey's arresting police officers, all of whom denied any instances of brutality. In addition, the two Assistant State's Attorneys who took Mahaffey's confession testified that Mahaffey had not complained of any brutality and that they saw no physical evidence of mistreatment during their contact with Mahaffey. The medical technician who prepared Mahaffey's intake report at the Cook County jail similarly noted that there was no evidence or complaints of physical brutality. Finally, the prosecution presented a photograph taken of Mahaffey at the time he gave his confession which, the district court below noted, contains "no sign of the substantial injury he claimed was inflicted by a blow to his nose." 978 F. Supp. at 776.

The trial court considered this testimony, along with the testimony given by Mahaffey and his wife, and concluded that "the great weight of the evidence" refuted Mahaffey's

claims of brutality and that "overwhelming evidence" refuted Mahaffey's *Miranda* violation claim. In this context, we do not believe that there is a reasonable probability that the result of the suppression hearing would have been different if Mahaffey's neighbor Charles Patterson had been called to testify. *See, e.g., Wright v. Gramley,* 125 F.3d 1038, 1041 (7th Cir.1997). Although Patterson heard sounds coming from Mahaffey's apartment, he states that he never saw Mahaffey at the time of his arrest. The trial judge found the testimony of the prosecution's witnesses credible, and it is unlikely that Patterson, without having seen physical evidence that Mahaffey was brutalized, would have altered the court's analysis. Thus, we conclude that Mahaffey is unable to demonstrate prejudice under *Strickland* for his trial counsel's failure to present Patterson's testimony.

### 2. Ineffective Assistance at the Sentencing Hearing

 As mandated by the Constitution, *see Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Illinois death penalty statute requires the sentencer to consider all mitigating factors relevant to imposition of a sentence of death. *See* ILL. COMP. STAT. 5/9–1(c). Accordingly, competent representation demands that defense counsel present an argument that focuses the attention of the jury on any mitigating factors. *See, e.g., Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). Like other strategic decisions, a defense counsel's reasonable choice to omit certain mitigating evidence in favor of alternative arguments does not render his assistance ineffective. *See id.* at 368. In the instant case, Mahaffey's trial counsel adopted a strategy of pleading for the jury's mercy at the sentencing hearing. As a general matter, we have recognized that "[a] simple plea for mercy may be a valid choice, *if* that plea focuses on the particular defendant and the circumstances of the particular offense." *Hall v. Washington,* 106 F.3d 742, 750 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997); *see also Eddmonds v. Peters,* 93 F.3d 1307, 1322 (7th Cir.1996),

*cert. denied,* —— U.S. ——, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997).

The mitigation evidence presented at Mahaffey's sentencing hearing consisted of the testimony of three of his relatives—his wife, his mother, and his sister—as well as the testimony of Mahaffey himself. Mahaffey's mother related the difficult circumstances of her son's upbringing in a "rough" and "violent" neighborhood, and she told the jury of Mahaffey's loving relationship with his family. She further said that her son's death would affect her "very much ... because I am a mother, and I love him deeply, and his presence would be missed." Mahaffey's wife testified similarly and told the jury of his close relationship with her and their children. Mahaffey testified and told the jury that his family would miss him if he were sentenced to death, and he discussed his desire to live: "I'm a human being. I have feelings. I have a heart. I desire to live." Mahaffey's counsel presented a coherent closing argument to the jury, discussing, among other things, the unplanned manner in which the Mahaffey brothers had arrived at the Pueschels' apartment and contrasting their crimes with a murder-for-hire. Decker also discussed the nature of punishment and argued that the jury should act mercifully and not be responsible for an individual's death. In addition, he focused the jury on the mitigation evidence that had been presented, stating that Mahaffey "has a family, he has a wife who loves him and children who depend on him, children who want him to remain alive in the penitentiary, a wife who wants him to remain alive in the penitentiary."

When considered in the context of the other available strategic alternatives, which we discuss *infra,* we do not believe that Decker's performance at sentencing fell below the level of reasonable competence. This case is not like *Hall,* in which the defense counsel's closing argument to the sentencing judge "relied upon sweeping and largely irrelevant appeals to the judge's personal beliefs and religious principles." 106 F.3d at 750. Here, Decker's presentation focused specifically on Mahaffey's situation and the impact that a sentence of death would have on Mahaffey's family. In addition, our hold-

ing in *Hall* was not based solely upon "counsel's failure in his closing argument to offer any reason other than blatant disregard of Illinois law for sparing Hall's life," *id.* at 749, a shortcoming which is not implicated in the instant case in any event. We also premised our holding in *Hall* upon the "total failure" of Hall's attorneys "to contact Hall in preparation for the sentencing hearing and their consequent failure to present his mitigation witnesses." *Id.* In this context, Mahaffey contends that Decker failed to prepare competently for the sentencing hearing, the issue to which we now turn.

Mahaffey argues that Decker provided ineffective assistance because he failed to obtain Mahaffey's school records and to investigate his mental health so that this evidence could be used in mitigation at the sentencing hearing. Decker's responses to the interrogatories posed by Mahaffey in connection with the evidentiary hearing stated that Decker was aware that Mahaffey "didn't have a stellar school record" and had only completed the eighth grade. This awareness, Mahaffey contends, should have compelled Decker to obtain the school records in the hope of learning more about Mahaffey's mental state. Mahaffey's post-conviction counsel obtained these school records, which indicated that Mahaffey had an IQ of 64 when he was ten years old, was transferred to a special education school when he was in the sixth grade, and had serious difficulties reading and spelling. Mahaffey argues that the information contained in these records would have compelled Decker to conduct further investigation into his mental health. *Cf. Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir.1996) (recognizing that it constitutes ineffective assistance to fail to conduct further investigation into a defendant's mental status when it is apparent from readily available evidence that the defendant has "some mental or other condition that will repay further investigation"), *cert. denied*, —— U.S. ——, 117 S.Ct. 113, 136 L.Ed.2d 65 (1996).

Further investigation, Mahaffey contends, would have included a psychological evaluation, such as the one ultimately conducted by Dr. Gunn, that would have revealed that Mahaffey is mentally retarded and suffers

from "borderline personality disorder." Mahaffey argues that if this mitigating evidence had been introduced, there is a reasonable probability that at least one of the twelve jurors who sentenced him would have refused to impose a death sentence. *See Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir.1996), *cert. denied*, —— U.S. ——, ——, 117 S.Ct. 1260, 1289, 137 L.Ed.2d 339 (1997). He therefore asserts that Decker provided ineffective assistance in failing to unearth this evidence and present it to the jury. *See Hall*, 106 F.3d at 749–50 ("Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance.").

The Constitution requires defense counsel in a capital case to conduct a reasonable investigation into potential mitigating factors. *See, e.g., Strickland*, 466 U.S. at 691, 104 S.Ct. 2052; *Stewart*, 74 F.3d at 135. A "reasonable investigation" does not mandate a "scorch-the-earth strategy," *see Hall*, 106 F.3d at 749, a requirement that would fail to consider the limited time and resources that defense lawyers have in preparing for a sentencing hearing. *See Stewart*, 74 F.3d at 135. Rather, the contours of a reasonable investigation are dictated by the circumstances of each case, including the facts of the crime, conversations with the defendant and others familiar with him, and other readily available sources of information, such as trial testimony. *See, e.g., Hall*, 106 F.3d at 749–50; *Stewart*, 74 F.3d at 135. While this evidence will in some cases indicate that further investigation would be beneficial, "[i]n other cases, where these indications are lacking, counsel may 'reasonably surmise from his conversations with [the defendant] that character and psychological evidence would be of little help.'" *Id.* (quoting *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052) (alteration in original). In this context, we recently have noted that "[i]t is reasonable for a lawyer to place a certain reliance on his client, so that if the client and his family and friends throw the lawyer off the scent, ... the lawyer cannot be faulted for failing to go

down the path thus closed off." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir.1998).

■■■■ Mahaffey's argument · can be in-·terpreted as claiming ineffective assistance on two distinct bases. The first asks us to establish a *per se* rule that a capital defendant's lawyer must always obtain available institutional records, such as school records, that might give rise to evidence of mitigating factors. We addressed this argument recently in *Thomas*, where the petitioner argued that his defense lawyer provided ineffective assistance by failing to subpoena his prison and school records and submit them to a psychiatrist for evaluation. Cognizant of the prevailing view that a determination of ineffectiveness typically depends on the circumstances of each case, *see id.* at 516, we recognized that such a *per se* rule would · constitute a new rule within the meaning of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Because we may not grant relief in habeas corpus proceedings on the basis of a new rule, *see id.*, we declined to decide whether the failure to sub-, poena institutional records was *per se* ineffective. *See Thomas*, 144 F.3d at 516. The same considerations apply in the instant case, and we are unable to grant relief upon Mahaffey's contention that a defense counsel's failure to obtain school records necessarily renders his assistance incompetent. Although the State did not raise *Teague*, we may invoke its rule even when the State has waived · it. *See, e.g., Thomas*, 144 F.3d at 516; *Winsett v. Washington*, 130 F.3d 269, 274 (7th Cir.1997).

■■■■ This leaves Mahaffey's contention that, given the circumstances of this particular case, Decker's failure to subpoena the school records fell below professional norms. In this context, Mahaffey relies upon the evidence that *was* apparent to Decker: Mahaffey "didn't have a stellar school record," he had only completed the eighth grade, and he contended that he was unable

to understand his *Miranda* warnings (a contention that Decker advanced at the suppression hearing). Mahaffey argues that this evidence should have led Decker to further investigate Mahaffey's mental state. *See, e.g., Hall*, 106 F.3d at 749–50. As part of the district court's hearing on Mahaffey's ineffectiveness claims, Decker responded to interrogatories regarding his preparation for the sentencing hearing. Decker stated that he asked both Mahaffey and his mother about Mahaffey's mental health history, and that both of them denied that Mahaffey had any mental problems.[9] More importantly, Decker's extensive conversations and contacts with Mahaffey led him to believe that investigation into Mahaffey's mental state was unwarranted. Decker testified that throughout the trial, he discussed strategy with Mahaffey and showed him police reports and documents, none of which Mahaffey had trouble understanding. Decker also considered Mahaffey's lengthy written confession, which Mahaffey had read and corrected. Based upon these factors, Decker stated that he had no indication that further investigation into Mahaffey's mental condition would have produced any mitigating evidence. This assessment of Mahaffey is consistent with that made by Mahaffey's own sister, who stated that "Jerry presented himself as though he had all this knowledge."

We must also consider in this context the factual findings of the district court judge, who had an opportunity to observe and listen to Mahaffey at the evidentiary · hearing. As we have discussed, in assessing Mahaffey's testimony, the district judge found that "if the Jerry Mahaffey I saw in 1997 is like the Jerry Mahaffey that Steven Decker saw in the mid–1980s, then · Decker is not to be faulted for failing to consider mental retardation." 978 F.Supp. at 770. We must accept the district court's finding in this regard, as Mahaffey has presented us with no evidence to indicate that it is erroneous. As the district court found, "nothing in his client's de-

9. While · the extent to which Decker prepared Mahaffey's mother for the sentencing hearing was disputed in the district court, the district judge credited Decker's testimony that he prepared Mahaffey's mother to testify. *See* 978 F.Supp. at 770. We must defer to such findings

of fact made by the district court unless they are clearly erroneous. *See, e.g., Griffin v. Camp*, 40 F.3d 170, 172 (7th Cir.1994). In any event, Mahaffey does not challenge on appeal the truthfulness of this aspect of Decker's account.

meanor or actions showed Steven Decker that his client had a mental condition that would mitigate sentence." 978 F.Supp. at 770. These observations were corroborated by Decker's discussions with Mahaffey's family, which similarly gave Decker no reason to believe that further investigation would prove fruitful.

We therefore conclude that Decker engaged in a reasonable investigation into Mahaffey's mental state, as there was nothing apparent to indicate to Decker that further investigation was warranted. The mere fact of Mahaffey's poor scholastic record, which in many cases can be attributed to factors other than mental or psychological difficulties, is insufficient to require an all-out campaign to uncover mitigating psychological evidence. Decker did consider his first-hand impressions of Mahaffey, along with his conversations with Mahaffey's family members, and came upon a dead end. *Cf. Thomas*, 144 F.3d at 515.

■ In this way, this case is quite unlike the situation in either *Hall, supra* at ——, or *Eddmonds v. Peters*, 93 F.3d 1307, 1323 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1441, 137 L.Ed.2d 548 (1997), in which a majority of the Court concluded that defense counsel performed incompetently by failing to investigate mitigating psychological evidence. In *Eddmonds*, there was a discovery file in the defense counsel's possession that contained substantial indications of mental illness, such that "even a cursory review of Eddmonds' file would have revealed long-standing, complex, and often severe mental problems." *Id.* at 1324. There is no comparable evidence of mental retardation or illness in this case. Thus, we are unable to characterize Decker's failure to uncover more

evidence than he did as falling below the minimum standards of professional competence required by the Sixth Amendment. Because Mahaffey is unable to satisfy the first prong of *Strickland, see* 466 U.S. at 694, 104 S.Ct. 2052, we reject this ineffective assistance claim.[10]

### III.

Mahaffey has not established constitutional error with respect to either his conviction or sentence. We therefore affirm the judgment of the district court.

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

In selecting the jury that would decide Jerry Mahaffey's fate-whether he was guilty of murdering Jo Ellen and Dean Pueschel, and whether he should be put to death for those murders—two prosecutors representing the State of Illinois exercised peremptory challenges to exclude the only seven African–American members of the jury venire. Mahaffey thus was convicted and ultimately sentenced to death by a jury comprised of eleven whites and one Asian–American. Fortunately for Mahaffey, the United States Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), while his direct appeal to the Illinois Supreme Court was pending. That court thus remanded Mahaffey's case, ordering the trial court to conduct a hearing and to determine whether jury selection here complied with the constitutional mandate of the *Batson* decision. After conducting that hearing, the state trial judge concluded that Mahaffey had failed to establish a prima facie case of discrimination under *Batson*. The Illinois Supreme Court affirmed on that basis, and

---

10. The district court, after finding that Decker had performed competently with respect to the sentencing hearing, nonetheless went on to consider whether Mahaffey could establish prejudice under *Strickland. See* 978 F.Supp. at 771. The court found that Mahaffey could not establish the required element of prejudice in any event. *See id.* at 771–74. Because we conclude that Decker's performance was not constitutionally deficient, we need not consider the prejudice element. *See Strickland*, 466 U.S. at 697, 104 S.Ct. 2052. However, we note that, while we have in some cases held that a failure to obtain and

present mitigating psychological evidence at sentencing was prejudicial, *see, e.g., Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir.1996), *cert. denied*, —— U.S. ——, ——, 117 S.Ct. 1260, 1289, 137 L.Ed.2d 339 (1997), we have concluded in other cases that such a failure in performance was not prejudicial. *See, e.g., Thomas*, 144 F.3d at 516–18; *Eddmonds*, 93 F.3d at 1319–22. A determination of prejudice will depend on the facts of each case, along with the strength of the mitigation evidence that could have been introduced. *Cf. Thomas*, 144 F.3d at 518.

the federal district court subsequently declined to issue a writ of habeas corpus. In finding no *Batson* violation in the selection of Mahaffey's jury, both the state supreme court and the federal district court effectively deferred to the trial court's conclusion that Mahaffey had failed to establish a prima facie case. *See People v. Mahaffey*, 128 Ill.2d 388, 132 Ill.Dec. 366, 539 N.E.2d 1172, 1184–85 (1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 799 (1990); *United States ex rel. Mahaffey v. Peters*, 978 F.Supp. 762, 781–82 (N.D.Ill.1997).

Today's majority is understandably uncomfortable with that conclusion, however, for it essentially means that an inference of discrimination, and therefore a prima facie case under *Batson*, does not arise even where the State has exercised peremptory challenges against all seven African–American venire persons in a racially-sensitive double murder trial involving an African–American defendant and white victims. Acknowledging that Mahaffey has presented a "strong argument" on the prima facie case (*ante* at 679), the majority opts to bypass that aspect of the *Batson* inquiry and to proceed directly to the ultimate issue of discrimination. Such a course is appropriate, my colleagues believe, because at the *Batson* hearing ordered by the Illinois Supreme Court, the State came forward with its reasons for striking the seven African–American jurors, and the trial judge explicitly found those reasons valid and non-pretextual. *Id.* at 680. In my view, that conclusion simply is not supported by the record of the *Batson* hearing. It also is inconsistent with the decisions issued in this case by the Illinois Supreme Court, the federal district court, and the state trial judge who presided at the *Batson* hearing. The majority reaches such a conclusion, moreover, in the face of the State's own insistence that *it has never articulated* its reasons for striking the seven African–American jurors.

As I will demonstrate below, the majority's analysis of the *Batson* issue relies on a mistaken premise—that the actual reasons for the challenged strikes were before the state trial judge and that those reasons were considered and accepted by him. To the con-

trary, the record demonstrates that the State never offered its reasons for striking the African–American jurors, as the State itself concedes, and those reasons thus were never considered by the state trial judge or by any state or federal court that subsequently has reviewed his work. The Illinois courts and the prosecutors who have been so intimately involved in this case for so long simply are not mistaken as to what occurred at the *Batson* hearing. It is rather the majority of this court, almost eleven years later, that I believe misreads the record in order to avoid the obvious conclusion that a remand on the *Batson* issue is required.

In my view, and I venture to say in the view even of my colleagues in the majority, Jerry Mahaffey plainly established a prima facie case of discrimination at the *Batson* hearing in November 1987. And because a prima facie case was shown, the State must now be required to articulate to the district court its race-neutral reasons for striking all seven African–Americans from Mahaffey's jury. At that point, the district court must decide for the first time in the extended history of this case whether the reasons offered for the seven strikes are valid, or whether those reasons are instead a pretext for discrimination. Jerry Mahaffey is entitled to at least that much before the State of Illinois carries out his death sentence. The United States Constitution, as interpreted by the Supreme Court in *Batson*, requires no less. Because a majority of this court is unwilling to give Mahaffey even that, I must respectfully dissent.

## I.

The fundamental mistake I find in the majority's opinion is its suggestion that the prosecutors actually offered their reasons at the *Batson* hearing for striking the seven African–American jurors. They plainly did not, as is clear from every other court's discussion of the issue, and from the State's own brief in this appeal. *See* Respondent's Br. at 13 ("The prosecution never tendered 'race-neutral' reasons at trial, nor during any appellate proceeding, state or federal.").[1]

1. The Respondent's brief further emphasized the point as follows:

What the State did offer at the *Batson* hearing, and what the majority now misconstrues as the State's race-neutral reasons for the strikes, were possible explanations for the challenges that were apparent in the record of the voir dire proceeding itself. The State argued to the trial judge at the *Batson* hearing that such possible explanations, if apparent from the record, could be considered at the prima facie case stage even before the State was required to articulate its true reason for any individual strike. According to the State, those possible explanations were relevant to whether the trial judge should draw an inference of discrimination for purposes of the prima facie case. *See Batson* Hearing Tr. at 12 (prosecutor argues that "in determining whether or not the defendant has made out a prima facie case, the trial judge may consider any apparent reasons for the prosecutor's challenges against minority jurors.").[2] Yet those "apparent reasons" are to be distinguished from the State's actual reasons, which, as the State pointed out almost eleven years ago at the hearing and now confirms in its brief to this court, have never been revealed. *See id.* at 25 ("Since the defendants have not even made a prima facie case on this issue, there is no further need for any . . . inquiry into why we exercised our challenges as we did."). Thus,

> The District Court itself made quite clear in its opinion, any explanations which had been given by the prosecution were "directed to explaining the pattern of challenges" used during the jury selection, rather than attempting to proffer race-neutral reasons to the court, which would have been premature due to petitioner's obvious failure to establish a *prima facie* case of discrimination. In fact, since the time of the original *voir dire,* the prosecutors have steadfastly refused to tender "race-neutral" explanations for their challenges until petitioner had demonstrated a *prima facie* case of discrimination. Even the Illinois Supreme Court found any "apparent explanations" for the State's challenges were "relevant circumstances which a trial court may consider when determining a *prima facie* case of discrimination." *Mahaffey,* 539 N.E.2d at 1184.

*Id.* (additional citations omitted). Counsel for the State then reiterated the point at oral argument, assuring us that the prosecutors have never in the long history of this case offered their true reasons for striking the seven African–American jurors. In my view, the majority's explanation for the State's position simply does not comport with the record here. *See ante* at 678–79 n. 7.

when the prosecutor proceeded to address the characteristics of five of the seven African–American jurors individually, he was not purporting to reveal the State's true reasons for striking those jurors; he was instead offering "reasons which are apparent from the record which justify the State's challenges against these minority jurors." *Id.* at 20. In the State's own view, then, its prosecutor never crossed the line into the pretext stage, as the majority now finds, because the prosecutor focused his entire argument on the requirements of the prima facie case. Indeed, the prosecutor concluded his argument at the *Batson* hearing by requesting that the trial judge find no prima facie case in the circumstances here. *Id.* at 26.[3]

As the majority points out, in responding to the prosecutor's argument, Mahaffey's counsel intimated that the State may have done more than merely argue the absence of a prima facie case. Yet after suggesting that the prosecutor may have crossed the line into the explanation stage, defense counsel observed that "[i]f this is done on the assumption that . . . a prima facie case [has] been presented, then I think that is a significant concession. Otherwise, much of what he said deserves review after your Honor has found

2. Later in the hearing, the prosecutor explained that:

> [I]n certain cases the justifications for some of the State's peremptories will not be apparent from the transcript of jury selection. However, it has been held in such cases that the defendants did fail to make out a prima facie case of discrimination where the transcripts show that most but not all of the State's peremptory challenges were clearly justified by facts which were apparent in the record.

*Id.* at 14–15. The State thus effectively argued at the *Batson* hearing that it was not required to reveal the true reasons for the strikes if possible explanations that were apparent from the record served to negate the existence of a prima facie case.

3. In the district court, Judge Zagel took the same view of the prosecutor's arguments at the *Batson* hearing: "In this case, the prosecutors elected to dispute the showing of the prima facie case though they did explicitly deny basing challenges on race. The detailed explanation they did offer was directed to explaining the pattern of challenges." *Mahaffey,* 978 F.Supp. at 781.

a prima facie case." *Id.* at 26–27. Later in the hearing, defense counsel reiterated that the issue before the court was whether a prima facie case had been shown, and counsel twice stated that if a prima facie case were found, Mahaffey would then address in more detail the possible explanations the prosecutor had offered. *See id.* at 28 ("As far as the specifics and the details, we will respond if your Honor finds a prima facie case.") & *id.* at 36 ("And we would wish to respond to each of those grounds if your Honor finds that there was a prima facie case.").[4] And counsel concluded his argument by asking the trial judge to find that Mahaffey had satisfied his burden under *Batson* of establishing a prima facie case of discrimination:

> The matter for your Honor at this time seems to be whether the fact that all Blacks were excluded by the State on peremptory challenge and there were no Blacks on the jury to try Black defendants, that we have at least established a prima facie case entitling us to a ruling by your Honor and an evaluation and consideration on the grounds and a decision.... So we would ask your Honor at this time to conclude there has been a showing of a prima facie case and therefore the State must demonstrate there has been neutral grounds for removing the jurors.

*Id.* at 36.

Having heard the arguments of both sides on the issue of the prima facie case, the state trial judge proceeded to address that issue alone. The court thus made no mention of defense counsel's request that he be given the opportunity to respond in more detail to any race-neutral reasons offered by the State if a prima facie case were found. Judge Hett began his analysis by reciting the elements of a prima facie case under *Batson*, making it abundantly clear that he was considering only that aspect of the *Batson* equation. As

the majority points out, Judge Hett then provided detailed observations on the jury voir dire, which led him to conclude that "[s]imilar types of people were also on the jury.... All of the people who were excused were similar to the people who were chosen. The Whites who were excused were similar to the Blacks who were excused." *Id.* at 51. Contrary to my colleagues' assertion, however, Judge Hett never suggested that the prosecutor had offered the State's race-neutral reasons for the strikes, nor did he ever indicate that he was assessing whether those reasons were a pretext for discrimination. *Cf. ante* at 680 ("Judge Hett considered in detail the prosecution's race-neutral justifications, conducted his own analysis regarding whether any of these justifications were pretextual, and concluded that Mahaffey had not shown racial discrimination."). Rather, the judge concluded from the pattern of strikes and the information revealed by the record of the jury voir dire that an inference of discrimination should not be drawn in these circumstances:

> Looking at the totality of the circumstances I do not believe that there has been a showing, a prima facie showing that the State exercised [its] challenges in a manner that showed racial discrimination. They treated both the Blacks and the Whites who were being excused in the same way. It is apparent in the record they used the same factors that I found as to Whites, again as to Blacks.

*Batson* Hearing Tr. at 54. Judge Hett therefore concluded that Mahaffey had failed to carry his burden of establishing a prima facie case under *Batson*. *Id.* at 55.

On appeal, the Illinois Supreme Court affirmed Judge Hett's conclusion regarding the absence of a prima facie case, and nowhere did that court suggest, as my colleagues now

---

4. According to my colleagues in the majority, Mahaffey's counsel "argued that at least some of the prosecution's asserted justifications were pretextual." *Ante* at 677. With the utmost respect, however, I again must disagree. It is clear from the transcript that defense counsel, like the prosecutor, argued only what the existing record revealed about the stricken jurors. Defense counsel asserted that the possible explanations pointed out by the prosecutor did not negate the existence of a prima facie case because white jurors with similar characteristics and opinions had been permitted to remain on the jury while African–American jurors with those characteristics and opinions had been excluded. *Id.* at 29–36. As I noted in the text, moreover, counsel twice told the trial judge that he would respond further on the pretext question if a prima facie case were found.

conclude, that the trial judge had made a finding on the ultimate issue of discrimination. In fact, the state supreme court expressly rejected Mahaffey's assertion that the trial judge had erred when he relied on the "apparent explanations" for the strikes offered by the State at the prima facie case stage. In so doing, Illinois' highest court read the record of the *Batson* hearing much differently than my colleagues do today. The Illinois Supreme Court said that "rather than relying on 'apparent explanations' for the State's challenges, the trial court merely reviewed the characteristics of the stricken jurors to determine their heterogeneity. This is a relevant circumstance which a trial court may consider when determining a prima facie case of discrimination." *People v. Mahaffey*, 132 Ill.Dec. 366, 539 N.E.2d at 1184 (citing *People v. Evans*, 125 Ill.2d 50, 125 Ill.Dec. 790, 530 N.E.2d 1360, 1365 (1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989)). The Illinois Supreme Court thus considered and rejected the very premise of today's majority opinion—that the State had crossed the line at the prima facie case stage by offering its race-neutral explanations for the strikes, and that the trial judge had found those explanations valid and non-pretextual. *See ante* at 680.

In articulating a contrary view, my colleagues inform us that the state trial judge's finding on the ultimate issue of discrimination is entitled to a presumption of correctness (*ante* at 679–80), which is certainly true had such an ultimate finding actually been made. As I have explained, however, no such finding ever was made by the Illinois courts in this case.[5] I therefore find it more than a bit ironic that the majority would

invoke such a presumption here, where it essentially finds that the Illinois courts were themselves confused about which aspect of the three-part *Batson* equation they actually were dealing with. How can the federal courts possibly afford a presumption of correctness to a state court finding that the state courts themselves did not purport to make? As I read the record, the state courts only found that Mahaffey had failed to make out a prima facie case of discrimination, and I do not think we are at liberty almost eleven years later to recast the issue simply because we may find the state courts' conclusion indefensible on this record.

### II.

Having demonstrated that the only issue decided by the Illinois courts, and therefore the only issue properly before us today, was whether Mahaffey established a prima facie case of discrimination, I must conclude that he did. Unlike the ultimate issue of discriminatory intent, which as a factual question is entitled to deferential review (*see Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712), the preliminary question of whether a prima facie case has been shown presents a mixed question of law and fact (*see, e.g., United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir.1994), *cert. denied*, 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995); *United States v. Alvarado*, 891 F.2d 439, 443 (2d Cir.1989), *vacated on other grounds*, 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990)), which I submit the appellate courts should review de novo. Although some of our sister circuits have utilized a clearly erroneous standard in their review of that question (*see Bergodere*, 40 F.3d at 516 (citing cases)), I believe that the Supreme Court's recent deci-

---

5. Because no such finding was made here, this case cannot be likened to *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), where a plurality of the Supreme Court found the prima facie case issue moot once the prosecutor had offered his race-neutral reasons for juror challenges. *Cf. ante* at 679. In that case, the prosecutor immediately volunteered his race-neutral reasons for striking two prospective jurors after a *Batson* objection was raised. *Hernandez*, 500 U.S. at 356, 111 S.Ct. 1859. Indeed, the prosecutor specifically stated that he had excused the two Hispanic jurors because he was uncertain that they would accept

the official interpreter's translation of testimony that would be given in Spanish. *Id.* There was thus no doubt in *Hernandez* that the prosecutor had offered his race-neutral explanations, and every court to consider the case recognized that he had done so. *Id.* at 358, 111 S.Ct. 1859. My two colleagues in the majority here, by contrast, are the only two judges in the extended history of this case who have concluded that race-neutral explanations were provided and that a finding was made on the ultimate issue of discrimination. *Hernandez*, in short, does not support the majority's decision to bypass *Batson's* prima facie case stage in the circumstances here.

sion in *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), points in the direction of de novo review. The question of whether an inference of discrimination may be drawn from a set of undisputed facts relating to the racial make-up of the jury venire and the prosecutor's exercise of peremptory challenges is, like the probable cause question before the Court in *Ornelas,* one over which the appellate courts should exercise a degree of control that a clear error standard would not afford. *Id.* at 697, 116 S.Ct. 1657. As in *Ornelas,* factual scenarios will recur in this context, and de novo review would allow for a measure of consistency in the treatment of similar factual settings, rather than permitting different trial judges to reach inconsistent conclusions about the prima facie case on the same or similar facts. *Id.* at 697–98, 116 S.Ct. 1657; *cf. Mahaffey,* 978 F.Supp. at 781 ("This is not to say that Judge Hett could not have decided the question the other way, but on this record, given his participation in the jury selection, his judgment that there was no prima facie case was permissible."). Ultimately, however, I find the standard of review question largely beside the point, for even if a more deferential standard were applied, I would have to conclude that Judge Hett clearly erred in finding that no inference of discrimination would arise from the facts and circumstances here.

I recognize, of course, that *Batson* requires that we look to all the relevant facts and circumstances in assessing whether an inference of discrimination should arise. *See Batson,* 476 U.S. at 96, 106 S.Ct. 1712. Yet by far the most important factor in this case, and one that I believe the Illinois courts were too quick to overlook, is that all seven African–American members of the jury venire were excused by the State, meaning that not a single member of Mahaffey's own race was seated on the jury that decided his fate.[6] This is therefore not a case in which only one or two members of a particular racial group were excused while other members of the same racial group remained; it is instead a case where the State exercised seven of thirteen total challenges to exclude every member of Mahaffey's own race. That strikes me as fairly compelling evidence of discrimination, at least at the prima facie case stage, where the State has not yet been required to articulate its race-neutral reasons for striking the African–American jurors. An inference of discrimination is particularly appropriate, I believe, in light of the Supreme Court's admonition in *Batson* that we be mindful of the fact that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" 476 U.S. at 96, 106 S.Ct. 1712 (quoting *Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)). The Supreme Court in *Batson* emphasized that an inference of discrimination may arise where the prosecutor makes a pattern of strikes against African–American jurors. *Id.* at 97, 106 S.Ct. 1712. I submit that such a pattern plainly is evident in the State's juror challenges here, where the prosecutor excused each and every African–American member of the jury venire. *See McCain v. Gramley,* 96 F.3d 288, 292 (7th Cir.1996) (inference of discrimination may be drawn "where there are only a few members of a racial group on the venire panel and one party strikes each one of them"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997); *United States v. Sowa,* 34 F.3d 447, 452 (7th Cir.1994) ("The government easily made its prima facie case that the peremptory challenges were motivated by race; each and every black venireperson [six in all] was challenged."), *cert. denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995); *Splunge v. Clark,* 960 F.2d 705, 707 (7th Cir.1992) (prima facie case shown where both African–American members of the jury venire were excluded by the prosecution).

And lest we forget, the crimes at issue in this case were obviously racially-sensitive— Mahaffey, a young African–American male from Chicago's South side, was charged with murdering a white couple on the North side, and with attempting to murder their young son. This is therefore a case in which the racial composition of the jury could potentially be a factor in how the jury might respond

---

**6.** There was of course an African–American alternate who sat through Mahaffey's trial, but she did not deliberate on the verdicts either at the conviction or penalty phase.

to Mahaffey's defense at trial, as well as to his arguments in mitigation at the capital sentencing phase. *See Williams v. Chrans,* 945 F.2d 926, 943–45 (7th Cir.1991), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). Before the judgment of the essentially all-white jury in this case is executed, I believe that the State at least should be required to explain why it excused each venire person of Mahaffey's own race.

I am sensitive to the fact that Judge Hett was present during the jury voir dire and that, in his view, all of the relevant facts and circumstances did not produce an inference of discrimination. Yet Judge Hett came to that conclusion only after comparing the seven African–Americans whom the State excused from the jury with the six whites who were similarly excused. The state trial judge essentially found that because the excused African–Americans and the excused whites had similar characteristics, an inference of discrimination should not be drawn from the decision to strike the African–Americans. *Batson* Hearing Tr. at 54. But rather than comparing the excused African–Americans to the excused whites, I think the trial judge should have been comparing the excused African–Americans to the whites who remained, for only through such a comparison could the judge assess whether race played any role in the State's challenges. If an excused African–American juror had characteristics and opinions that were similar to those of a white juror who sat, for example, then the obvious inference, at least prior to the articulation of a race-neutral explanation for the strike, would be that the strike was racially–motivated. As far as the voir dire record would reveal, the stricken juror's race would be the only characteristic distinguishing the African–American from the white who was retained. I find it significant in that regard that Judge Hett found at the Batson hearing that the whites who sat on Mahaffey's jury were similar to the African–Americans the State had excused. *Id.* at 51. That finding indicates to me that the African–Americans on the jury venire may have been singled out, as they may have been treated differently than whites with the same or similar characteristics. And the inference of discrimination that would arise in that circumstance is unaffected by the fact that some whites with the same characteristics also may have been excused—the State still struck all the African–Americans while retaining some of the whites, and despite having strikes available that went unused.

In short, I believe that the showing made by Mahaffey at the *Batson* hearing was sufficient as a matter of law to require the State to come forward with race-neutral explanations for each of the challenged strikes. We should therefore remand this case to the district court to enable the State to do so now.

### III.

The crimes of which Jerry Mahaffey stands convicted are indeed horrific, and the evidence certainly supports the jury's conclusion that Mahaffey was a perpetrator of those crimes. I have no doubt, moreover, that an Illinois jury could conclude, as this jury did, that Mahaffey deserved the death penalty as a consequence. But how I wish I were confident that the jury making those decisions had been selected in a constitutional manner. I simply cannot be confident on this record.

The State of Illinois should once and for all be required to articulate its true reason for striking each of the seven African–American venire persons from the jury that ultimately rendered those judgments. As the State itself concedes, it has never done so in the extended history of this case, nor has any court ever assessed the legitimacy of those reasons under the dictates of *Batson.* The majority's conclusions to the contrary, as I believe I have demonstrated, are without support in the state court record.

For all of these reasons, I most respectfully dissent.